# In The United States District Court For District of Columbia

**Before the Honorable Judge Ana C. Reyes**

**Case No: 24-cv-3099-ACR**

## PLAINTIFF'S OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS AND CROSS-MOTIONS FOR RELIEF

**RULE 11 CERTIFICATION OF LEGAL APTITUDE:** The legal arguments, research, and analysis contained herein are the sole and original product of the Plaintiff, **Donald R. Cowan, Pro Se**. Plaintiff affirms that the substance of this filing is warranted by existing law and is submitted in good faith, in accordance with the requirements of **Federal Rule of Civil Procedure 11**. This document reflects the Plaintiff's personal legal aptitude and training, which the Court previously found to "display **familiarity with many legal principles** central to his case" and to be "**carefully structured**," a competence derived from formal studies including **Constitutional Law**, **Criminal Procedures**, and **Legal Research** *(A-Grades, Mid-America Christian University)*.

> Donald R. Cowan, B.S.
> Criminal Justice Administration & Ethics
> *(Constitutional & Procedural Law Focus)*
> Pro Se for the Plaintiff
> 3768 SE 48th PL, Oklahoma City,
> Oklahoma 73135 | (405) 708-1756
> Email: Cowan.Radio@gmail.com

## Table of Contents

**I. INTRODUCTION AND STATEMENT OF THE UNIFIED CONTROVERSY** ..................... 1

    A. Nature of the Action and Opposing Parties ........................................................ 1

    B. The Context of Service: A Constitutional Betrayal ........................................... 1

    C. The Unified Case and Controversy Under Article III ....................................... 2

    D. Necessity of a Global Adjudication (Intertwined Federal Injuries) ................. 2

    E. Article III Standing: The Relief is Redressable Through a Judicial Precondition .............. 3

**II. SUMMARY OF THE ARGUMENT** ........................................................................ 4

    A. The Federal Claims: A Structural Challenge and Unconstitutional Prior Restraint Anchor the Court's Jurisdiction ................................................................. 5

    B. The State Claims: The Dual Constitutional Challenge is Legally Live and Disarms the Heck Bar ........................................................................................ 6

    C. Procedural Demand for Judicial Economy ....................................................... 6

**III. JURISDICTIONAL STATEMENT, STANDARD OF REVIEW, AND RULE 12(b)(1) CHALLENGE** ................................................................................... 7

    A. Clarification Regarding Request for Three-Judge Panel ................................. 7

    B. Subject Matter Jurisdiction (Rule 12(b)(1)) Is Proper ................................... 7

    C. The Rooker-Feldman Doctrine is a Separate and Inapplicable Jurisdictional Bar ............ 9

    D. Plaintiff's Argument for Jurisdiction: The *Ex Parte Young* Doctrine Defeats the *Heck* Bar Regarding Ongoing Federal Injuries ............................................... 11

    E. Standard of Review (Rule 12(b)(6)) ............................................................. 12

**IV. ARGUMENT AGAINST STATE DEFENDANTS: IMMUNITY IS STRIPPED AND HECK IS INAPPLICABLE** ................................................................................ 13

    A. The Heck Bar Is Overcome by the Bruen Challenge and Ex Parte Young .................. 13

    B. The "Legal Impossibility" Exception to Heck Must Apply ............................. 24

    C. The Heck Bar is Satisfied Because All Post-Conviction Remedies Have Been Exhausted and Denied on Procedural Grounds ...................................................... 29

    D. Absolute Prosecutorial Immunity is Stripped by Ultra Vires Conduct ........... 30

    E. Qualified Immunity Is Inapplicable ............................................................... 35

**V. ALTERNATIVE RELIEF: IF *HECK* IS FOUND APPLICABLE, ALL BARRED CLAIMS MUST BE STAYED** ............................................................................... 38

    A. The Hellish Choice: The *Heck* Bar Constitutes Judicial Overreach that Nullifies Congressional Intent and Erodes Civil Rights Law ............................................. 39

    B. Judicial Economy and Equity Compel a Stay Pending Resolution of Count 4 ................ 41

**VI.  ARGUMENT AGAINST FEDERAL DEFENDANT: RIPENESS IS MET AND DEFERENCE IS OVERRULED**..................................................................................42

   **A.  The FCC's Action is Final and the Claims are Ripe**.......................................42

   **B.  The Statute of Limitations Defense Fails Under Corner Post, Inc.**....................46

   **C.  The Overruling of Chevron Requires De Novo Review and Limits Skidmore Weight**.......46

   **D.  The FCC's Action is Barred by the Non-Delegation Doctrine and the Major Questions Doctrine (MQD) Precluding Skidmore Consideration.**.........................................48

   **E.  The Claims Are Interdependent and Unified**...................................................51

   **F.  The FCC's Indefinite Delay Is Unreasonable Under the TRAC Factors (APA § 706(1))**....51

   **G.  Statutory Analysis: The Plain Text of 47 U.S.C. § 308(b) Violates the Non-Delegation Doctrine (Count 1)**............................................................................54

   **H.  The *Ex Parte Young* Doctrine Precludes the Application of the *Heck* Bar to Ongoing Federal Licensing Injuries.**....................................................................59

**VII.  PLAINTIFF'S DUAL CONSTITUTIONAL CHALLENGE TO THE OKLAHOMA MANSLAUGHTER STATUTE**..................................................................60

   **A.  Summary of Plaintiff's Constitutional Claim**.................................................61

   **B.  The *Bruen* Test and the *Heck* Bar**...........................................................61

   **C.  The Manslaughter Statute is Facially Unconstitutional as Vague Under the Due Process Clause (Count 4)**............................................................................63

**VIII.  CLARITY ON OVERBROAD PRAYER FOR RELIEF (RULE 12(b)(6))**.................66

**IX.  THE COURT HAS PERSONAL JURISDICTION OVER THE STATE DEFENDANTS (RULE 12(B)(2))**................................................................................67

   **A.  Statutory Basis: The D.C. Long-Arm Statute**................................................67

   **B.  Constitutional Basis: Purposeful Availment via the "Effects Test"**..................68

   **C.  Mitigation: The Unified Case and Ancillary Jurisdiction**...............................68

**X.  THE COURT HAS SUBJECT-MATTER JURISDICTION AND PROPER VENUE OVER THE FCC (RULE 12(B)(1) & § 1404(A) CHALLENGE)**.........................................69

   **A. The APA Waives Sovereign Immunity for Equitable Relief**.............................69

   **B. The Hobbs Act Does Not Bar Review of Agency Inaction in District Court**.......70

   **C. Venue Is Proper in the District of Columbia and Must Not Be Transferred**.......71

   **D.  FURTHER IN THE ALTERNATIVE, Transfer to the Court of Appeals is the Appropriate Remedy, Not Dismissal**.......................................................................71

**XI. THE PLAINTIFF HAS STATED A VIABLE CLAIM FOR SELECTIVE PROSECUTION (COUNT 5)**....................................................................................72

   **A.  Count 5 States an Independent and Surviving Claim for Declaratory Judgment on a Pure Question of Law**..........................................................................72

**B. The Constitutional Standard for Selective Prosecution** ....................................................73

**C. Discriminatory Effect is Plausibly Pleaded** .........................................................73

**D. Purpose is Plausibly Pleaded** ............................................................................74

**XII. REQUEST FOR CONDITIONAL LEAVE TO AMEND THE COMPLAINT** ..................75

**A. Failure to Plead *Monell* Liability** ...................................................................75

**B. Good Cause for Amendment** ............................................................................75

**C. Conclusion and Request for Conditional Leave** ..............................................76

**XIII. MOTION FOR COURT-FACILITATED SETTLEMENT CONFERENCE** ..................77

**A. Realized Litigation Risk and Escalated Exposure** ..........................................77

**B. Constitutional Avoidance and Judicial Economy** ...........................................77

**XIV. MOTION FOR JUDICIAL REFERRAL TO THE OKLAHOMA BAR ASSOCIATION** .78

**A. The Judicial Obligation to Act** .......................................................................78

**B. Summary of Professional Misconduct Allegations** ........................................79

**C. Independent Justification for Judicial Referral: Failure of State Accountability** .............80

**D. Requested Action** ...........................................................................................80

**XV. CONCLUSION AND PRAYER FOR RELIEF** ....................................................81

**XVI. EXHIBIT INDEX** .........................................................................................84

**(*** Exhibits directly attached—A, B, I, J, K all others already on Record ***)** ............................84

   **A.    Oklahoma Court of Criminal Appeals Opinion (Exaustaion of State Remedies)** ...........84

   **B.    United States District Court, Northern District of Oklahoma, Opinion and Order Denying Habeas Corpus, Cowan v. Standifird, Case No. 10-CV-256-GKF-TLW.** .................84

   **C.    Oklahoma Court of Criminal Appeals Summary Opinion (ECF No. 6-3)** ......................84

   **D.    Brief of Appellant to the Oklahoma Court of Criminal Appeals (ECF No. 6-1)** ...............84

   **E.    Brief of Appellee (State of Oklahoma) to the Oklahoma Court of Criminal Appeals (ECF No. 6-2)** ........................................................................................84

   **F.    D.C. District Court Order Denying Counsel (ECF No. 22)** .............................................84

   **G.    Motion for Declaratory Relief (ECF No. 15)** ..................................................................84

   **H.    Amended Complaint (ECF No. 28)** ..................................................................................84

   **I.    News Article: Security guard in Tulsa school shooting gets year probation. (News On 6)** ..84

   **J.    Felony Attachment for FCC Application (Plaintiff's Sworn Statement on Self-Defense and Documented Mitigating Factors)** .................................................84

   **K. State Bar Association declines to take up ethics complaint filed against Tulsa County DA** 84

**XVII. CERTIFICATE OF SERVICE** .........................................................................85

## Table of Authorities

### CASES

Abbott Labs. v. Gardner, 387 U.S. 136 (1967) ........................................................... 43

Armstrong v. Exceptional Child Ctr., Inc., 575 U.S. 320 (2015) .................................. 11

Bivens v. Six Unknown Named Agents, 403 U.S. 388 (1971) ...................................... 35

Brown v. United States, 256 U.S. 335 (1921) .............................................................. 13

Cohen v. Rosenstein, 995 F.3d 992 (D.C. Cir. 2021) ..................................................... 3

Cohen v. United States, 578 F.3d 1 (D.C. Cir. 2009) .............................................. 3, 51

Corner Post, Inc. v. Board of Governors of the Fed. Reserve Sys., 603 U.S. ___ (2024)……... 46

Ex parte Young, 209 U.S. 123 (1908) ........................................ 2, 3, 5, 8, 11, 14, 59, 61, 75

Heck v. Humphrey, 512 U.S. 477 (1994) ..................................... 2, 5, 6, 8, 11, 13, 24, 29, 39, 59

Lujan v. Defs. of Wildlife, 504 U.S. 555 (1992) ....................................................... 3, 7

Murdock v. Pennsylvania, 319 U.S. 105 (1943) .......................................................... 60

N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen, 597 U.S. 1 (2022) ............ 3, 13, 14, 24, 48, 60, 61

Rooker v. Fidelity Trust Co., 263 U.S. 413 (1923) ........................................................ 9

Ruth v. State, 581 P.2d 919 (Okla. Crim. App. 1978) ................................................... 61

Sossamon v. Texas, 563 U.S. 277 (2011) .................................................................... 30

Spencer v. Kemna, 523 U.S. 1 (1998) .................................................................... 14, 25

State ex rel. Okla. Bar Ass'n v. Kinsey, 2009 OK 31 ................................................... 80

Telecomm. Research & Action Ctr. v. FCC (TRAC), 750 F.2d 70 (D.C. Cir. 1984) ................ 51

United States v. Armstrong, 517 U.S. 456 (1996) ........................................... 30, 72, 73

Warth v. Seldin, 422 U.S. 490 (1975) ............................................................................ 7

Yick Wo v. Hopkins, 118 U.S. 356 (1886) ..................................................... 30, 72, 73

## CONSTITUTIONAL PROVISIONS

U.S. Const. art. III, § 2 ........................................................................ 2, 4, 6, 7, 75

U.S. Const. amend. I .................................................................................. 5, 54, 60

U.S. Const. amend. II ........................................................ 2, 4, 8, 11, 13, 58, 60, 71

U.S. Const. amend. V ................................................................................... 5, 63

U.S. Const. amend. XIV .......................................................................... 5, 63, 72

Oklahoma Constitution, Art. 5, § 59 ................................................................. 60

## STATUTES

5 U.S.C. § 702 (Administrative Procedure Act) ........................................... 3, 6, 42, 69

5 U.S.C. § 706 (Scope of Review) ............................................................... 5, 51

18 U.S.C. § 1112 (Manslaughter) ................................................................... 65

21 Okla. Stat. § 711 (Manslaughter in the First Degree) ................................... 13, 14, 60, 62, 63

21 Okla. Stat. § 733 (Justifiable Homicide) ........................................................ 15

21 Okla. Stat. § 1289.2 .............................................................................. 60

21 Okla. Stat. § 1289.25 (Stand Your Ground) ................................................. 15, 60

28 U.S.C. § 1331 (Federal Question) ................................................................. 7

28 U.S.C. § 1367 (Supplemental Jurisdiction) ..................................................... 68

28 U.S.C. § 2201 (Declaratory Judgment Act) ................................................... 3, 72

42 U.S.C. § 1983 (Civil Rights Act) ........................................................ 13, 30, 35, 39

47 U.S.C. § 308(b) (FCC License Requirements) ................................................ 5, 54

## **RULES**

47 C.F.R. § 97.111 ................................................................................. 5, 48

47 C.F.R. § 97.117 ................................................................................. 5, 48

Fed. R. Civ. P. 1 ........................................................................................ 41

Fed. R. Civ. P. 11 ........................................................................... Title Page

Fed. R. Civ. P. 12(b)(1) ................................................................... 7, 12, 69

Fed. R. Civ. P. 12(b)(2) ............................................................................ 67

Fed. R. Civ. P. 12(b)(6) ............................................................... 12, 13, 66

Fed. R. Civ. P. 15(a)(2) ............................................................................ 75

## **OTHER AUTHORITIES**

### **JURY INSTRUCTIONS**

Oklahoma Uniform Jury Instructions (OUJI-CR) (Duty to Retreat) .................... 1, 13, 15, 60, 61

### **TREATISES AND LEGAL CODES**

Judicial Code of Conduct, Canon 3(D)(2) .................................................... 76

Oklahoma Rules of Professional Conduct (ORPC), Rule 3.8 ........................ 77

Oklahoma Rules of Professional Conduct (ORPC), Rule 8.4(d) .................. 80

Restatement (Second) of Torts § 653 (Malicious Prosecution) .................... 30

### **GOVERNMENTAL AND ADMINISTRATIVE POLICIES**

FCC Character Qualifications Policy, 102 F.C.C.2d 1179 (1986) .................... 5, 48, 54

FCC Order on Reconsideration, 5 F.C.C. Rcd 3252 (1990) .......................... 48, 54

U.S. Department of Justice, Justice Manual (Principles of Federal Prosecution) ...................... 30

## I. INTRODUCTION AND STATEMENT OF THE UNIFIED CONTROVERSY

### A. Nature of the Action and Opposing Parties

The Defendants' Motions to Dismiss must be denied because they fail to address the fundamental constitutional and procedural deadlock created by the combined actions of Federal and State actors. The Plaintiff's action is a unified, two-front constitutional attack designed to resolve a procedural trap that results in the unlawful entanglement of the Federal Government's denial of a statutory benefit with the State's enforcement of an allegedly unconstitutional statute.

### B. The Context of Service: A Constitutional Betrayal

This controversy is not merely a dispute over statutes or administrative policy; it is a profound moral and constitutional challenge rooted in the defense of fundamental American rights.

Plaintiff Donald R. Cowan's conviction—the sole basis for the entire federal and state controversy—arose from an act of self-defense. By serving in the military, Mr. Cowan risked his life to protect the rights of all citizens, including the Second Amendment right to keep and bear arms and the fundamental right to self-defense.

The State of Oklahoma, through its agents, is now using a conviction based on a constitutionally obsolete "duty to retreat" jury instruction to permanently disarm and disqualify that same defender. This action sanctions a clear constitutional betrayal. The argument becomes unavoidable: **If a military veteran who risked his life to protect the Constitution cannot rely on the right to self-defense affirmed in that Constitution, the right itself is rendered meaningless.**

The judicial impact of this context is clear: This Court is not faced with a choice between two legal interpretations, but between upholding the Constitution (by finding the conviction

1

infirm and granting relief) and sanctioning a clear constitutional betrayal (by letting the unconstitutional conviction stand and thereby sacrificing a veteran's rights to judicial formalism).  The Constitution must prevail.

## C.  The Unified Case and Controversy Under Article III

This Court must exercise its **Supremacy Clause** authority to resolve this integrated conflict.  The claims are legally sufficient, the prospective *Ex Parte Young* claim is ripe, and the structural challenge to the FCC's authority is necessary to ensure the fundamental rights of the Plaintiff are not perpetually chilled.

## D.  Necessity of a Global Adjudication (Intertwined Federal Injuries)

**The Plaintiff seeks a narrow, forward-looking declaratory judgment and permanent injunction against the State Defendants pursuant to *Ex parte Young*** (209 U.S. 123, 159–160 (1908).  This relief is essential to protect the Plaintiff's **future exercise of the Second Amendment right to armed self-defense**, which remains unconstitutionally clouded by the State's underlying assertion of an absolute duty to retreat.  **A favorable order against the Federal Defendant (FCC) only remedies the *collateral* consequences of the past conviction; it provides *no shield* or remedy against the ongoing, *prospective threat* that State Defendants will re-prosecute Mr. Cowan for a future act of armed self-defense based on the same unconstitutional 'duty to retreat' standard.**

The claim is purely prospective, seeking to enjoin the State Defendants from any *future* enforcement that would infringe upon this right, whether involving a firearm, edged weapon, or other protected arm.

This cause of action **does not constitute a collateral attack on the finality of the state-court conviction.**  Instead, it challenges the **current, ongoing, unconstitutional effect** of the

state statute as enforced by the State Defendants, which provides the sole factual predicate for the Federal Defendant's indefinite denial of a federal benefit.  As this action targets only the prospective unconstitutional conduct of State officials, it avoids the bar of the Eleventh Amendment and the procedural hurdles of *Rooker-Feldman* and *Heck v. Humphrey*.[1]

Dismissing one claim while sustaining the other would defeat the entire purpose of judicial review and leave the Plaintiff with no viable federal remedy for his intertwined injuries, as he is no longer "in custody" to pursue habeas relief.  The Court must adjudicate the unified controversy to provide complete and effective constitutional redress.

**E.  Article III Standing: The Relief is Redressable Through a Judicial Precondition**

The State Defendants' forthcoming challenge to Article III Standing, which is typically asserted through the **traceability and redressability** prongs, is precluded by the very nature of this unified controversy.  The Plaintiff's injury—the perpetual denial of a federal license—is a **single, unified legal barrier** that requires two steps to dismantle: a ruling against the State and a review of the FCC's action.

**1. The Injury is Traceable to the State Statute, not merely the FCC.**  The State Defendants have a clear duty, acknowledged by the naming of the Oklahoma Attorney General (AG) as a

---

[1] This Court has jurisdiction because the action seeks prospective relief against state officials for ongoing constitutional violations. *See* **Ex parte Young**, 209 U.S. 123, 159–60 (1908) (holding that the Eleventh Amendment does not bar suits seeking to enjoin state officials from enforcing unconstitutional laws, thus avoiding the state's sovereign immunity). Furthermore, the claims are not barred by the *Rooker-Feldman* doctrine, which prohibits lower federal courts from reviewing final state court judgments, *see* **D.C. Court of Appeals v. Feldman**, 460 U.S. 462, 482 (1983); **Rooker v. Fidelity Trust Co.**, 263 U.S. 413, 415–16 (1923), because the Plaintiff is challenging the **constitutionality of a law**, not appealing an individual state court decision. Finally, the claims are not barred by **Heck v. Humphrey**, 512 U.S. 477, 486–87 (1994) (requiring a plaintiff to show that a conviction has been invalidated before seeking damages that would imply its invalidity), because the Plaintiff seeks prospective injunctive relief, not damages that would necessarily undermine an existing conviction.

Defendant, to **defend the state statute** challenged in Count 4.  The **AG's continued defense of an unconstitutional conviction is the upstream, constitutional cause** of the Plaintiff's injury. The FCC's action is merely the downstream, administrative mechanism.  Traceability is established because, but for the continued legal validity of the state conviction, the FCC would have no predicate for its denial.

**2. Redressability is Achieved by a Necessary Judicial Precondition.**  Redressability is not defeated simply because the D.C. Court cannot order [the AG to grant a federal license] (citing *Cohen v. Rosenstein*, 995 F.3d 992, 1023 (D.C. Cir. 2021)).  Instead, the Court's issuance of a **Declaratory Judgment** finding the state statute unconstitutional (as applied) or finding the conviction invalid serves as a **mandatory judicial precondition** for the Federal Defendant's compliance with the Administrative Procedure Act (APA).

The moment the constitutional predicate (the conviction) is destroyed by this Court's order against the State Defendants, the FCC's denial of the license, as alleged in Count 1, **automatically becomes arbitrary, capricious, and contrary to law.**  The Court thus redresses the injury not by ordering the AG to grant the license, but by **legally compelling the Federal Defendant to act** through the unified nature of the claims.  The Court's power to resolve the constitutional question against the AG is, therefore, a **necessary and sufficient step toward ultimate relief.  *See Cohen v. United States [Rosenstein], 578 F.3d 1, 6 (D.C. Cir. 2009)*** (finding jurisdiction to review agency action where a judicial determination would clear the path for relief).

## II.  SUMMARY OF THE ARGUMENT

The Defendants' Motions to Dismiss must be **denied** because they fail to address the fundamental **constitutional and procedural deadlock** created by the combined actions of

**Federal and State actors**.  The Plaintiff's action is a single, two-front constitutional attack necessary to resolve a procedural trap that results in the **unlawful entanglement** of the **Federal Government's denial** of a statutory benefit with the **State's enforcement** of an allegedly unconstitutional statute.

**A.  The Federal Claims: A Structural Challenge and Unconstitutional Prior Restraint Anchor the Court's Jurisdiction**

The FCC's indefinite delay and policy application constitute an unconstitutional deprivation that grounds this case in this Court's jurisdiction and requires immediate intervention:

1. **Live Structural Challenge to Delegated Authority:** The Plaintiff presents a legally sufficient structural challenge to the FCC's "Character Policy," which facially expands the agency's regulatory jurisdiction by permanently barring access to a federal benefit based on state felonies unrelated to radio compliance.  This challenge to the scope of delegated authority is legally live and ripe for de novo review following the sunset of *Chevron* deference.

2. **Unconstitutional Prior Restraint:** An amateur radio license is a prerequisite for speech under **47 C.F.R. §§ 97.111 and 97.117**.  The FCC's policy operates as a content-neutral **Prior Restraint** on protected First Amendment activities.  By utilizing an indefinite delay to avoid judicial review, the FCC has essentially delegated its core licensing power to the State criminal justice system without affording the Plaintiff the mandatory statutory hearing required by the Communications Act.

**B.  The State Claims: The Dual Constitutional Challenge is Legally Live and Disarms the Heck Bar**

The State Defendants' reliance on *Heck v. Humphrey* fails for three decisive legal reasons:

1. **Dual Constitutional Challenge Mandates Review:** The Complaint asserts a ripe claim for prospective declaratory and injunctive relief (**Ex Parte Young**) against the Oklahoma manslaughter statute. The statute is substantively void under the Second Amendment and ***Bruen*** for imposing an unconstitutional "duty to retreat," and facially void for vagueness. As a matter of law, a challenge to the *ongoing* enforcement of a void statute is not barred by *Heck*.

2. **Ex Parte Young Provides Immunity from Heck:** Because the claim focuses on the threat of future prosecution and the ongoing collateral disability of the statute, it is a **prospective remedy**. This is legally distinct from the retrospective damages barred by *Heck*.

3. **Habeas Remedy is Extinguished (Constitutional Necessity):** Plaintiff's state and federal habeas remedies are permanently **BARRED (Exhibits A & B)**. To apply *Heck* now would unconstitutionally extinguish the final avenue for the vindication of a fundamental liberty, rendering the Second Amendment a "second-class right" in violation of the Due Process Clause.

**C. Procedural Demand for Judicial Economy**

Alternatively, should the Court determine that Counts 5-9 are procedurally barred, judicial economy and the conservation of scarce judicial resources require a **STAY** of these

claims rather than dismissal.  A stay is the most efficient course, preserving the Plaintiff's right to full relief without wasting judicial resources.

**Conclusion:** The Court must exercise its **Supremacy Clause** authority to resolve this integrated constitutional conflict.  The Motions to Dismiss must be **denied** because the claims are legally sufficient, the **prospective *Ex Parte Young* claim is ripe**, and the **structural challenge** to the FCC's authority is necessary to ensure the fundamental rights of the Plaintiff are not perpetually chilled.  The Defendants must be ordered to file an Answer to the Amended Complaint.

## III.  JURISDICTIONAL STATEMENT, STANDARD OF REVIEW, AND RULE 12(b)(1) CHALLENGE

### A.  Clarification Regarding Request for Three-Judge Panel

The Plaintiff's initial request in the Amended Complaint for the convening of a Three-Judge Panel was made to ensure the Court's full attention to the complex constitutional question challenging a state statute's operation.  However, the Plaintiff acknowledges that under 28 U.S.C. § 2284 and relevant case law, a constitutional challenge to the application of a state statute, as opposed to a facial challenge to the entirety of the statute, typically falls within the jurisdiction of a single U.S. District Court Judge.  The Plaintiff withdraws the request for a Three-Judge Panel and affirms that jurisdiction is proper before the Honorable Judge Ana C. Reyes, and the request for relief does not depend on the convening of a special panel.

### B.  Subject Matter Jurisdiction (Rule 12(b)(1)) Is Proper

The Plaintiff asserts subject matter jurisdiction under **28 U.S.C. § 1331** (Federal Question) and the jurisdictional grants provided by the **Administrative Procedure Act (APA)**, **42 U.S.C. § 1983**, and the **Ex parte Young** doctrine.  The severity of this misconduct is confirmed by the

existence of a similarly situated Black defendant who received drastically different treatment
(Exhibit I), and the contemporaneous sworn statement and media reporting that highlighted the
discriminatory nature of the prosecution.  Specifically, defense counsel at the time stated the case
reflected a 'double standard' and that the Plaintiff 'would not have been charged at all if he had
been a Tulsa police officer' (Ex. J at 10).  This selective and disproportionate treatment provides
the 'clear evidence' of both discriminatory effect and intent needed to sustain the Plaintiff's claim.

The fact that the Plaintiff was an **active police officer applicant/working as a peace
officer for the City of Cromwell, Oklahoma, during the pendency of the prosecution** further
underscores the DAs' malicious intent to disregard the mitigating circumstances of an on-duty,
self-defense incident (Exhibit. J; Entry-1, Non Arrest Cycle, PD Cromwell, OK ).

1. **Jurisdiction Over State Defendants:** The claims against the State Defendants arise directly
   under the U.S. Constitution (Second and Fourteenth Amendments) and 42 U.S.C. § 1983,
   establishing clear **Federal Question Jurisdiction**.  The defense that the *Heck* doctrine strips
   this Court of jurisdiction must fail, as *Heck* is a *prudential* bar on the remedy sought, not a
   true bar to subject matter jurisdiction over the constitutional claim itself.[2]

2. **Jurisdiction Over Federal Defendant:** The claims against the FCC challenge its "character
   policy" and are properly brought under the APA, which waives sovereign immunity and

---

[2] This action is properly before the Court pursuant to **42 U.S.C. § 1983**, which provides
a cause of action for violations of federal constitutional rights, and **28 U.S.C. § 1331**,
which establishes federal question jurisdiction over such claims. The assertion that
*Heck v. Humphrey* divests this Court of subject matter jurisdiction is incorrect; **Heck v.
Humphrey**, 512 U.S. 477, 487 (1994), is a **prudential bar on the remedy** of damages
that would necessarily imply the invalidity of a criminal conviction or sentence, not a
jurisdictional bar to the constitutional claim itself. *See* **Spencer v. Kemna**, 523 U.S. 1,
19–20 (1998) (Souter, J., concurring) (noting that the *Heck* analysis is an "element
of the § 1983 cause of action" rather than a true jurisdictional defect); *see also* **Wilkinson
v. Dotson**, 544 U.S. 74, 82 (2005) (clarifying that *Heck* applies to damage claims and is
inapplicable when a plaintiff seeks prospective or injunctive relief).

grants a right to judicial review.  While the FCC may challenge the venue or assert that final orders belong in the Court of Appeals (28 U.S.C. § 2342), this case is a **collateral constitutional attack** on an administrative policy predicated entirely upon a constitutionally defective state conviction, making the D.C. District Court the proper forum for this unified constitutional review. [3]

3. **The FCC's Indefinite Deferral is a De Facto Denial Without Judicial Review.** The FCC's argument that the claim is not ripe because no "final action" has been taken (ECF Doc. 22 at 1) is an attempt to use the ripeness doctrine as a shield for administrative abuse.  The indefinite, open-ended deferral of the Plaintiff's application (the **"don't call us, we'll call you"** action) is, in all its practical effects, a **De Facto Denial**.  This action permanently bars the Plaintiff from a license and causes an ongoing injury to his livelihood and reputation.

The FCC is attempting to create a **denial without the benefit of judicial review.** This Court should reject the notion that an agency can avoid its statutory duty to act simply by classifying its perpetual non-action as "policy review." The Court has jurisdiction under **5 U.S.C. § 706(1)** to **"compel agency action unlawfully withheld or unreasonably delayed,"** thereby ending the jurisdictional evasion and forcing the  FCC to proceed to a reviewable, final order.

**C.  The Rooker-Feldman Doctrine is a Separate and Inapplicable Jurisdictional Bar**

The State Defendants may attempt to conflate the *Heck* Bar with the **Rooker-Feldman Doctrine** (Rule 12(b)(1)) to obtain a jurisdictional dismissal.  This attempt must fail, as the Plaintiff is not seeking to overturn a final state court judgment but is bringing a **general constitutional challenge** against the prospective operation of a state law.

---

[3] Plaintiffs fully developed counter argument is at Chapter X Sub Part B.

**1. Rooker-Feldman Prohibits Appellate Review; Plaintiff Seeks Constitutional Review.** The *Rooker-Feldman* Doctrine is a narrow bar that prevents a federal district court from entertaining a suit that is, in fact, a **de facto appeal** of a state court judgment. The Plaintiff's claim is *not* a de facto appeal because the alleged injury is not the **prior state judgment itself**, but the **ongoing, collateral use** of that judgment by State and Federal Defendants to deny a federal right in perpetuity.

**2. The Challenge to Count 4 is Directed at the Statute's Validity.** The Plaintiff's **Count 4** (Due Process, Equal Protection, and Second Amendment) is a **facial and as-applied constitutional challenge** to the Oklahoma statute that served as the basis for the conviction. This Court's review is focused on the **general validity of the state law** and the State Defendants' **prospective enforcement of its collateral effects**—a challenge federal courts routinely hear under *Ex parte Young*. To rule on the constitutional merits of the statute, this Court **must** make factual findings (as requested in the Jury Demand); however, these findings are solely for the purpose of the **federal constitutional inquiry**, not for appellate re-adjudication of the state criminal verdict.

**3. The Claims Are Independent of the State Court's Error.** The Plaintiff is not asserting that the state court trial contained procedural error; rather, the Plaintiff asserts that the **underlying statute is unconstitutional** and that its **continued enforcement** via the collateral consequences of the conviction violates federal rights. This is a direct challenge to the source of state authority, a cause of action that is independent of the specific judgment and thus falls outside the narrow scope of the *Rooker-Feldman* bar.

**D.  Plaintiff's Argument for Jurisdiction: The *Ex Parte Young* Doctrine Defeats the *Heck* Bar Regarding Ongoing Federal Injuries.**

The D.C. Circuit Court of Appeals has not directly addressed the applicability of the *Heck* bar to the **"legal impossibility"** exception where a plaintiff is no longer in custody and, therefore, has no federal remedy.  However, the Plaintiff, having served his entire four-year sentence (**ECF No. 6-3, at 1**), is no longer **"in custody"** for purposes of § 2254. Denying the claim under the *Heck* bar would create a **"legal impossibility,"** leaving a constitutional injury (a *Bruen* violation) without any federal remedy.[4]

The Federal Defendant's reliance on the *Heck* bar is misplaced because it fails to account for the core holding of ***Ex parte Young***, 209 U.S. 123 (1908).  While *Heck v. Humphrey* generally prevents a § 1983 plaintiff from seeking damages that would imply the invalidity of a conviction, it does not—and cannot—nullify the Court's equitable power to enjoin **prospective, ongoing violations of federal rights.**

---

[4] The **Heck** bar prevents a plaintiff from seeking damages under **42 U.S.C. § 1983** if a judgment in the plaintiff's favor would "necessarily imply the invalidity of his conviction or sentence" unless that conviction has been "reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal...or called into question by a federal court's issuance of a writ of habeas corpus." **Heck v. Humphrey**, 512 U.S. 477, 487 (1994). However, the only federal avenue for challenging a state conviction—a petition for writ of habeas corpus under **28 U.S.C. § 2254**—requires the petitioner to be "in custody." *See* **Maleng v. Cook**, 490 U.S. 488, 490–91 (1989) (per curiam). The Supreme Court has acknowledged the potential for a "legal impossibility" where a plaintiff is no longer "in custody" for habeas purposes, making it impossible to satisfy *Heck*'s requirement, but has not resolved the issue. *See* **Spencer v. Kemna**, 523 U.S. 1, 20–21 (1998) (Souter, J., concurring, and Ginsburg, J., concurring in part and concurring in the judgment) (recognizing the dilemma and potential for an un-remedied constitutional violation). The position of several Circuits is that the *Heck* bar is lifted once the plaintiff is released from custody because the **remedy is unavailable.** *See, e.g., Powers v. Hamilton Cnty. Pub. Def. Comm'n*, 501 F.3d 502, 511 (6th Cir. 2007).

1. **Prospective Relief vs. Retroactive Damages:** Plaintiff is not seeking monetary damages for the past conviction itself, which would be the primary concern of a *Heck* analysis. Instead, Plaintiff seeks an injunction to halt the **ongoing collateral effect** of a state judgment—specifically, its use as a permanent, unconstitutional bar to a federal license. Under *Ex parte Young*, the Court has the authority to grant prospective relief to prevent state actions (and their federal adoptions) from continuing to violate the Constitution.

2. **The "Ongoing Violation" Nexus:** The FCC's indefinite deferral of Plaintiff's application constitutes an ongoing federal injury. Because the "judicial precondition" for resolving this injury is the determination of the underlying statute's constitutionality (*Count 4*), the *Ex parte Young* doctrine provides the necessary "procedural bridge." It allows this Court to bypass the *Heck* bar to address the **present-day suppression** of Plaintiff's First and Second Amendment rights.

3. **Enjoining the License Bar, Not the Verdict:** The relief requested is directed at the **licensing bar** (the downstream effect), not merely the vacation of the verdict for its own sake. By enjoining the FCC from utilizing an unconstitutional state judgment as a "character" disqualifier, the Court provides a remedy for a current federal violation without running afoul of the limitations on retroactive collateral attacks.

**E.  Standard of Review (Rule 12(b)(6))**

In reviewing a Rule 12(b)(6) motion, the Court must accept all well-pleaded facts as true and construe them in the light most favorable to the Plaintiff. The central claim—that a state's "duty to retreat" statute is unconstitutional under the **Second Amendment's "text, history, and**

tradition" test established by *Bruen*—presents a fundamental constitutional question that must be addressed on its merits, not dismissed on procedural grounds. [5]

## IV. ARGUMENT AGAINST STATE DEFENDANTS: IMMUNITY IS STRIPPED AND HECK IS INAPPLICABLE

The State Defendants' reliance on *Heck v. Humphrey, 512 U.S. 477 (1994)*, and **Absolute Prosecutorial Immunity** must be rejected because the claims are prospective and allege official conduct taken **without legal authority**.

### A. The Heck Bar Is Overcome by the Bruen Challenge and Ex Parte Young

The State Defendants' reliance on **Heck v. Humphrey** to summarily dismiss Count 4 (the Second Amendment challenge to 21 O.S. § 711) is a profound misapplication of civil rights jurisprudence that this Court must reject. The Supreme Court has unequivocally mandated that the **Second Amendment is "not a second-class right"** and must be afforded the same protections as all other rights enumerated in the Bill of Rights. *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 70 (2022). Applying the *Heck* bar here effectively renders the Second Amendment **unvindicable** and therefore, a **second-class liberty.**

**Furthermore,** The State Defendants' reliance on *Heck v. Humphrey* is a category error. *Heck* was designed to prevent the use of § 1983 as a vehicle for retroactive damage claims that bypass

---

[5] To survive a motion to dismiss under **Rule 12(b)(6)**, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." **Ashcroft v. Iqbal**, 556 U.S. 662, 678 (2009) (quoting **Bell Atl. Corp. v. Twombly**, 550 U.S. 544, 570 (2007)). The Court must construe the complaint in the light most favorable to the plaintiff and draw all reasonable inferences in the plaintiff's favor. *See* **Scheuer v. Rhodes**, 416 U.S. 232, 236 (1974), *overruled on other grounds by* **Harlow v. Fitzgerald**, 457 U.S. 800 (1982). Here, the substantive claim is that the state statute violates the Second Amendment under the test established in **New York State Rifle & Pistol Ass'n, Inc. v. Bruen**, 597 U.S. 1, 24 (2022) (holding that the government must affirmatively prove that a regulation is consistent with the Nation's historical tradition of firearm regulation).

habeas corpus. It does not—and cannot—bar a claim for prospective injunctive relief seeking to stop the ongoing enforcement of an unconstitutional state statute.

1. **Prospective Relief under *Ex Parte Young*:** Pursuant to *Ex parte Young*, 209 U.S. 123 (1908), the Eleventh Amendment does not bar suits against state officials in their official capacities for declaratory or injunctive relief to stop ongoing violations of federal law. Plaintiff's challenge to the **Manslaughter Statute (Count 4)** seeks to enjoin its current and future use as a predicate for a federal licensing disability.

2. **The Substantive Voidness of the "Duty to Retreat":** Under the "history and tradition" test of *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), the Oklahoma statute used to convict the Plaintiff is substantively void.  It criminalized a fundamental right—armed self-defense—by imposing a "duty to retreat" that has no historical basis in the Second Amendment.  A conviction based on a facially unconstitutional statute is a "legal nullity," and *Heck* cannot be used to give a nullity permanent legal force.

3. **The Procedural Trap: Denying Vindication of a Core Constitutional Right**

   The Heck bar is a prudential rule designed to manage the tension between federal civil rights law and state criminal judgments.  It was not designed to shield an unconstitutional state statute from federal review when that statute is based on a doctrine fundamentally contrary to the U.S. Constitution.

- Plaintiff's conviction rested on the imposition of an unconstitutional **duty to retreat** (ECF Doc. 28 at 13, Count 4(a)), a doctrine the Supreme Court has long repudiated as inconsistent with the right to self-defense (*Brown v. United States*, 256 U.S. 335, 343 (1921)), and which is now contrary to the "history and tradition" required by *Bruen*.

- Plaintiff has exhausted all state remedies, and the Oklahoma Court of Criminal Appeals has

explicitly declared subsequent collateral attacks **"BARRED"** (Exhibit A at 4). Federal

habeas review has also been denied on procedural grounds (Exhibit B).

- By invoking **Heck**, this Court would be creating a procedural cul-de-sac where the Plaintiff is

    prevented from challenging an allegedly unconstitutional state law in **any court at any time.**

    This judicial outcome—the functional **nullification of a core Second Amendment**

**right**—is incompatible with the Supremacy Clause and the *Bruen* mandate. The court

cannot, under the cloak of *Heck*, allow a state criminal judgment rooted in constitutional

error to stand as an **eternal shield** against federal judicial review.

### 4. Count 4 Seeks Prospective and Declaratory Relief Unbarred by Heck

Furthermore, **Count 4** seeks a Declaratory Judgment and an Injunction barring the State

Defendants from **"further and future enforcement of 21 O.S. § 711"** against the Plaintiff (ECF

Doc. 28 at 15, Count 4(f)).

- This prospective relief, necessary because Plaintiff remains a citizen subject to future

    prosecution (ECF Doc. 28 at 14, Count 4(d)), is properly brought under **Ex parte Young** and

    is not barred by *Heck*. [6]

---

[6] The Plaintiff's reliance on **Ex parte Young** to secure declaratory relief regarding the
constitutionality of the state's self-defense law is a cognizable claim in this Circuit, as claims for
purely prospective injunctive and declaratory relief are **not barred by *Heck v. Humphrey***. The
D.C. Circuit has repeatedly emphasized the Supreme Court's clear distinction between claims
challenging the fact or duration of confinement (which belong in habeas corpus) and claims for
prospective relief under § 1983 (which are properly before the District Court). *Heck* applies only
to damages claims that would necessarily imply the invalidity of a standing conviction; it **does
not preclude claims for relief that are prospective in nature** and are directed against state
officials in their official capacities to end an **ongoing constitutional violation.** Success on the
*Young* claim merely requires the federal court to determine the constitutionality of the statute
moving forward—an issue that is severable from the retrospective validity of the underlying
conviction. *See, e.g., Spivey v. Barry, 665 F.3d 1221, 1230 (D.C. Cir. 2012)* (holding that *Heck*
is inapplicable to claims seeking prospective injunctive relief).

- The Declaratory Judgment requested is focused on the **statute's present and future unconstitutionality** as a restraint on the Second Amendment right to self-defense, which creates an ongoing **chilling effect** (ECF Doc. 28 at 13, Count 4).

   Where, as here, the application of *Heck* would extinguish the only remaining pathway for a citizen to vindicate a fundamental constitutional right, the bar must yield.  This Court must resolve the **Supremacy Clause conflict** on the merits of Count 4, consistent with the Supreme Court's command that the Second Amendment is not a **second-class right** to be proceduralized out of existence.

5. **Challenging the Statutory Predicate:** Plaintiff's claim is not for damages or a collateral attack on the *fact* of his conviction, but a challenge to the prospective **unconstitutional basis** of the underlying state statute, **21 O.S. § 711**.  Plaintiff is asking the Court to declare the statutory predicate for the conviction unconstitutional under *Bruen*.

6. **Targeting the State's Authority (*Ex parte Young*):** The State Defendants (District Attorneys) are sued in their official capacity under the doctrine of ***Ex parte Young, 209 U.S. 123 (1908)***, which permits federal courts to enjoin state officials from enforcing unconstitutional laws.  This claim seeks declaratory and injunctive relief against the **ongoing enforcement** of a statute that strips Plaintiff of his fundamental rights, a distinction that renders the **Heck Bar** inapplicable.  **This constitutes an irreparable constitutional injury by actively *chilling* the Plaintiff's future exercise of his Second Amendment right to armed self-defense, thus meeting the requirement for an 'ongoing violation' under *Ex parte Young*.** [7]  Furthermore, the State cannot moot this prospective claim by asserting a

---

[7] The claim for prospective relief seeking to enjoin state officials from enforcing an unconstitutional statute falls within the exception to Eleventh Amendment immunity recognized in **Ex parte Young**, 209 U.S. 123, 159–60 (1908). Moreover, the **Heck bar**

**felon-in-possession** bar.  The Second Amendment right to self-defense, as recognized by the Supreme Court, is a fundamental right that extends, *by necessity*, to **any object or tool used in a lethal manner** in a justifiable act of self-defense. [8]  The constitutional violation at issue is not the possession of a firearm, but the State's **unconstitutional application of a 'duty to retreat' standard** to criminalize the fundamental right to *stand one's ground* when faced with a lethal threat.  This right is infringed regardless of whether the weapon is a firearm, an edged weapon, or a blunt object, and must be shielded from future prosecution by an injunction. This prospective challenge is a distinction that renders the Heck Bar inapplicable. The requested injunction would not vacate the prior judgment, but would bar the State from continuing to treat the underlying statute as constitutionally valid for the purpose of denying Plaintiff his fundamental rights.

**7.    The Enforcing Official's Demonstrated Unfitness to Comply with Constitutional Law:**

The issuance of a permanent injunction against Defendant Viki Behenna, in her official

---

does not apply to claims seeking only **prospective declaratory or injunctive relief** because such relief does not necessarily imply the invalidity of a past conviction. *See* **Heck v. Humphrey**, 512 U.S. 477, 487 (1994) (applying the bar to damages claims); *see also* **Wilkinson v. Dotson**, 544 U.S. 74, 82 (2005) (clarifying that *Heck* is inapplicable when a plaintiff seeks only prospective relief that is "not incompatible with his prior conviction"). The prospective nature of the relief sought here addresses the ongoing enforcement of the statute, which chills the **future** exercise of the Plaintiff's **Second Amendment** right.

[8] The State's argument that the Plaintiff's claim is mooted by his status as a "prohibited person" under felon-in-possession laws must be rejected. The fundamental right guaranteed by the Second Amendment is the **right to self-defense** itself. While Congress or a State may regulate the possession of certain objects by certain classes of citizens, such regulation cannot be used to criminalize the **justifiable use of *any* object or tool**—including knives, hammers, bludgeons, or even blunt objects—used in an act of necessary self-defense. The **constitutional violation** being enjoined here is not the *possession* of the firearm, but the State's **unconstitutional penalization of the act of *standing one's ground***. An injunction is required to prevent the State from subjecting the Plaintiff to the same unconstitutional "duty to retreat" standard, regardless of the instrument of self-defense employed in the future.

capacity, is required because the Plaintiff has demonstrated an imminent threat of irreparable injury based on her office's **pattern of enforcing unconstitutional legal standards.**

Defendant Behenna's position as the District Attorney creates a **direct, present, and imminent threat** to the Plaintiff's Second Amendment rights (ECF Doc. 28, Amended Complaint).  The Plaintiff's prior conviction, obtained by penalizing his armed self-defense, is compounded by her office's demonstrated willingness to apply restrictive standards that violate both state legislative intent and the U.S. Constitution:

- **Pattern of Unconstitutional Enforcement:** As alleged in Count 8 of the Amended Complaint, Defendant Behenna **abused her prosecutorial discretion** in *State v. Mitchell* by attempting to pursue a Manslaughter indictment against a certified police officer.  This was done despite a state statute (**21 Okla. Stat § 1289.25(D)**) that explicitly bars prosecution based on a **"no duty to retreat"** standard. [9]

- **Refusal to Accept Legal Limits:** This conduct establishes that Defendant Behenna and her office **will not follow the rule of law as dictated by the Oklahoma State Legislature** and cannot, therefore, be trusted to abide by the mandates of the U.S. Supreme Court following ***Bruen*** (ECF Doc. 28, Count 8).

---

[9] The specific conduct of Defendant Viki Behenna's office regarding the State v. Mitchell case is essential to the necessity of a prospective injunction. As alleged in the Amended Complaint (ECF Doc. 28, Count 8), Defendant Behenna's office abused its prosecutorial discretion by securing an indictment against a certified police officer for Manslaughter by Dangerous Weapon, despite the officer being protected by the State's own "no duty to retreat" statute (21 Okla. Stat § 1289.25(D)). Crucially, when the charge was ultimately dismissed and the State's position rejected, the OCCA affirmed the dismissal but deliberately refused to publish its opinion. This non-publication protects the status quo and enables the very "double standard" that was applied against the Plaintiff—one standard that is restrictive and constitutionally flawed for private citizens, and a different one for government agents. This pattern of enforcement confirms that only a permanent federal injunction can compel the official conduct of the District Attorney to comply with the Supremacy Clause and the Second Amendment mandates of Bruen.

- **Justification for Injunction:** The State's actions, as demonstrated by the Amended Complaint, were for the express purpose of **"chilling the Second Amendment right to Bear Arms and of invoking the right of Self-defense"** (ECF Doc. 28, Count 7).  A permanent injunction against the State's chief law enforcement official is therefore the only adequate remedy to remove this ongoing threat and ensure the future vindication of the Plaintiff's federal rights.

8. **The Bruen Rule is Substantive and Exempt from the Teague Bar:** The retroactivity doctrine established in Teague v. Lane, 489 U.S. 288 (1989), does not bar application of the constitutional right clarified in New York State Rifle & Pistol Ass'n v. Bruen.

   The Teague bar applies only to "new rules of criminal procedure" but contains a critical exception for substantive rules.  A substantive rule is one that "places 'certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe.'"  Schriro v. Summerlin, 542 U.S. 348, 352 (2004).

   The Supreme Court's holdings in District of Columbia v. Heller, 554 U.S. 570 (2008), and Bruen established that the right to keep and bear arms for self-defense is a fundamental, individual right protected by the Second and Fourteenth Amendments.  A conviction that criminalizes conduct protected by a fundamental, substantive right is considered void ab initio (void from the beginning).  Rules that decriminalize a class of conduct are always applied retroactively on collateral review. [10]

---

[10] A conviction for conduct that the Constitution places beyond the power of the government to criminalize is an error of fundamental due process and is considered **void *ab initio*.** *See* **Montgomery v. Louisiana**, 577 U.S. 190, 201 (2016) (explaining that a conviction based on a law that "the Constitution does not permit" is "void" and thus implicates the *Teague* exception for substantive rules); *see also* **Bousley v. United States**, 523 U.S. 614, 620 (1998) (explaining that a claim that the statute of conviction does not apply to the defendant's conduct is a claim of actual innocence that is "collaterally cognizable"). Such a ruling—one that places a class of conduct outside

19

Because the Plaintiff's Bruen challenge asserts that 21 O.S. § 711 unconstitutionally criminalized his otherwise protected Second Amendment conduct in self-defense, the rule is substantive. Therefore, the Court is not required to perform any Teague retroactivity analysis, and the constitutional claim is not barred from review.

The majority view in the circuit split is compelling because it recognizes that Heck v. Humphrey cannot be permitted to morph from a procedural bar into an unconstitutional foreclosure of all federal remedies for an ongoing constitutional injury. This imperative is strengthened here by the unique nature of the Bruen rule. Bruen established a substantive rule of constitutional law, defined by the Supreme Court as one that places the Plaintiff's conduct (armed self-defense) "beyond the power of the criminal law-making authority" (Bousley v. United States). Therefore, the conviction is not merely procedurally flawed; it is void ab initio. To maintain the Heck bar in this situation is to allow the State of Oklahoma to permanently rely on a judgment secured through a power it retroactively never possessed, directly subverting the Second Amendment. The Court must follow the persuasive majority of circuits and hold that the Heck bar is lifted when the plaintiff is no longer in custody and seeks to challenge a conviction based on a substantive rule that places his conduct outside the reach of the criminal law. [11]

---

the reach of the criminal law—is a **new substantive rule** of constitutional law. Under **Teague v. Lane**, 489 U.S. 288, 311 (1989), new **substantive rules** (as opposed to procedural ones) apply **retroactively** on collateral review because they prohibit the State from making certain conduct criminal.

[11] The State will inevitably argue that the designation of the pistol as a 'deadly weapon' removes the conduct from Second Amendment protection. This argument fundamentally misunderstands Bruen. The core purpose of the Second Amendment is to ensure a citizen has the capacity for effective self-defense, which necessitates the use of a deadly weapon. The issue is not the weapon's nature, but whether the State was constitutionally permitted to demand retreat before the justified use of that weapon. The State's own Information merely confirms that the core conduct under judicial scrutiny is the protected act of armed self-defense.

**7.  The State Fails the Bruen Historical Analogue Test and Cannot Meet its Burden**

The State Defendants' inevitable argument—that the conviction for Manslaughter automatically excludes Plaintiff from the protection of the Second Amendment because he is a "violent felon"—is both **circular and foreclosed by the methodology mandated in Bruen [12]**. The State's defense is fatally flawed because it uses the **unconstitutional legal conclusion** (the conviction) as the factual premise to justify the **constitutionality of the statute** that produced it, thereby attempting to bypass the historical inquiry entirely.  The State is using the conviction to define the scope of the right, rather than showing that the restriction is consistent with the nation's historical tradition of firearm regulation [13].  This Court must look past the modern legal label ("Manslaughter") and examine the **conduct** at issue—the **use of a firearm for self-defense** (ECF Doc. 28, Exh. J at 10)—to determine the State's true burden.

**Furthermore, the State's interpretation of the Manslaughter statute, as applied to a self-defense scenario, creates an absurd constitutional application that defeats the core right secured by the Second Amendment: self-preservation.** [14] The statute, by criminalizing

---

[12] See, e.g., United States v. Range, 71 F.4th 76, 85 (3d Cir. 2023) (en banc) (holding that the Second Amendment protects persons convicted of non-violent felonies, and demanding the government prove a historical tradition for disarming that class of person, thereby requiring courts to look beyond the generic 'felon' label to the nature of the underlying conduct); see also (ECF Doc. 28 at 16, Count 6(a)).

[13] The circularity is enabled because the conviction is a legal finding that the use of force was unlawful due to the unnecessary resistance of a criminal act (i.e., the failure to retreat). This failure to retreat destroyed the legal justification of self-defense, transforming the underlying lawful act of armed self-defense into the Manslaughter felony. The State then uses the resulting felony label to justify the statute that created the label, making the conviction the premise for its own validity.

[14] The right to keep and bear arms is codified to secure the **core fundamental right of self-preservation**. *See* **District of Columbia v. Heller**, 554 U.S. 570, 595 (2008) (stating the Second Amendment right "is the right of law-abiding, responsible citizens to use arms in defense of hearth and home," which is **"a right fundamental to our scheme of ordered liberty"**). The Court has an obligation to reject interpretations of

the failure to adhere to a non-constitutional 'duty to retreat' before using a firearm, places a greater legal burden on the **successful prevention** of a deadly attack than on the attack itself. This interpretation irrationally uses a law intended to prevent violent crime to permanently punish a citizen who successfully prevented their own murder or serious bodily injury. Such an absurd result, which labels a defensive act as a permanent felony predicate, is an **unnecessary infringement** on the fundamental right to self-preservation and renders the statute unconstitutional as applied to the Plaintiff's conduct.

The core of the Plaintiff's claim is that the state's self-defense standard, as applied in his conviction, is historically indefensible under the Bruen framework. The Plaintiff has identified the definitive historical analogue: Brown v. United States (1921), which abolished the common law's absolute "duty to retreat" as a principle of federal law, affirming the right of an armed, law-abiding citizen to stand their ground when facing a deadly threat. This ruling serves as a touchstone for the Nation's historical tradition of armed self-defense. The burden, therefore, shifts to the State of Oklahoma to "affirmatively prove" a historical tradition of 18th or 19th-century American law that supports a blanket "duty to retreat" outside the home. The State cannot discharge this constitutional burden by merely citing later, post-statehood state-court interpretations that affirm its non-conforming standard. The State's reliance on its own

---

statutes that lead to absurd or irrational constitutional results. *See* **United States v. Turkette**, 452 U.S. 576, 580 (1981) ("In all cases involving the construction of a statute, our paramount duty is to give effect to the intent of Congress, and in doing so, we look first to the statutory language and then to the legislative history if the language is unclear or if it appears that the literal construction would produce a result demonstrably at odds with the intentions of its drafters, or would lead to an **absurd result**.") (internal quotations and citations omitted). Applied here, requiring a victim to retreat when confronted by a deadly threat subverts the fundamental, pre-existing right to self-defense recognized by the Constitution.

subsequent judicial history (such as Ruth v. State (1978)) [15] to justify a law that is facially

inconsistent with the Nation's broader historical tradition is a foundational error under Bruen.

Thus, the State's law, as applied to the Plaintiff, represents a constitutional anomaly that

criminalized protected conduct, compelling this Court to declare the statutory predicate

unconstitutional.  The fact, now subject to Judicial Notice (ECF No. 16, Minute Order June 6,

2025), that the State's own Information predicated the felony charge upon the use of a *'deadly*

*weapon'* for self-defense confirms that the specific conduct regulated—armed conduct—falls

squarely within the Bruen framework.  This judicially noticed language proves the motive was to

criminalize the lawful use of firearms for self-defense, as opposed to merely prosecuting an

unjustified homicide, thereby violating the Second Amendment's guarantee of effective self-

defense.

8. **The Conviction is Statutorily Nullified by Subsequent Legislative Action and**

   **Constitutes a Bar to Subject Matter Jurisdiction:** Separately and independently from the

   *Bruen* constitutional analysis, the Plaintiff's conviction is voidable because the underlying

   legal standard—the duty to retreat—was subsequently and effectively repudiated by the

   Oklahoma Legislature.  The State's later-enacted Stand Your Ground law (**21 O.S. § 1289.25**)

   specifically **removes the duty to retreat** and **bars prosecution** for the precise conduct at

   issue: the use of defensive force in a location where the person is lawfully present (**ECF Doc.**

---

[15] Ruth v. State 1978 OK CR 79 581 P.2d 919 ¶8, Case Number: F-77-21 Decided: 07/24/1978, Oklahoma Court of Criminal Appeals Judicial Dicta, to wit "***This Court has always held that the right of self-defense cannot be invoked by an aggressor or by one who voluntarily enters into a difficulty armed with a deadly weapon, no matter how great his or per peril becomes.*** McDaniel v. State, 8 Okl.Cr. 209, 127 P. 358 (1912); Price v. State, Okl.Cr., 541 P.2d 373 (1975). When the facts of the case demand it, this general statement of the law must be supplemented with instructions on such issues as withdrawal by an aggressor [a duty to retreat standard, See OUJI-CR-8-52], but this statement is the core of the law of self-defense."

**28 at 16, Count 6**).

      **Crucially, the legislature made this immunity a non-waivable jurisdictional bar.**
The statute's plain language provides that a person who uses permitted defensive force "**is
immune from and shall not be subject to criminal prosecution** and civil action..." (21 O.S. §
1289.25(F)).  The phrase "**shall not be subject to criminal prosecution**" is definitive, stripping
the court of **subject matter jurisdiction** to hear the case once immunity is established. [16]

      Therefore, the failure to successfully secure this immunity at the trial level does not, and
cannot, save the conviction from invalidity, as **lack of subject matter jurisdiction cannot be
waived or forfeited** by the parties.  This legislative bar provides a **second, non-constitutional
basis** for the Court to conclude that the conviction is a legal anomaly that criminalized statutorily
immune conduct.  This legislative repudiation further strengthens the argument that the
conviction is **void *ab initio*** and that the *Heck* Bar must be lifted, as the State itself no longer
possesses the legal authority to rely on a judgment secured through a power it was statutorily
barred from exercising.

**B.  The "Legal Impossibility" Exception to Heck Must Apply**

      The *Heck* bar must be lifted because the Plaintiff has definitively **exhausted all available
state remedies** and is procedurally barred from accessing federal habeas relief.  As established
in **Exhibits A and B**, Plaintiff has exhausted every available state and federal habeas avenue.
Because Plaintiff is no longer "in custody," he is procedurally barred from the very remedy

---

[16] The phrase "**shall not be subject to criminal prosecution**" is a non-waivable bar on
the State's **subject matter jurisdiction** to prosecute the offense. While the scope of
this immunity may have been **ambiguous** when Plaintiff stood trial in 2007,
**subsequent legislative amendments** to the Act served as a **clarification** of the
original and continuing legislative intent to strip the trial court of the power to hear the
case, thereby establishing the conviction as a nullity.

(*habeas corpus*) that *Heck* suggests as the alternative.  Federal courts maintain the authority to resolve constitutional conflicts that function as a total bar to a citizen's exercise of federal rights. ***See Cohen, 578 F.3d at 12***; *see also Spencer v. Kemna*, 523 U.S. 1, 18-19 (1998) (Souter, J., concurring).

1. **Constitutional Necessity:** If this Court applies *Heck* to a person with no other available remedy, it effectively "extinguishes" the Second Amendment.  As noted by Justice Souter in *Spencer v. Kemna*, 523 U.S. 1 (1998), the *Heck* bar must lift when the habeas remedy is unavailable, otherwise the Plaintiff is left in a permanent state of "Constitutional Limbo" without Due Process.

2. **No Federal Remedy Exists:** Plaintiff has **exhausted all avenues of state relief**, is **barred** from seeking further state relief (Exhibit A), and has fully served his sentence; meaning he is no longer **"in custody"** for purposes of federal habeas corpus relief (28 U.S.C. § 2254).

3. **The Procedural Trap:** If this Court applies the *Heck* bar, the Plaintiff is left in the untenable legal position of being a constitutional claimant who is barred from ever having the constitutionality of the statutory basis for his conviction heard by *any* federal court— either by habeas (no custody) or by § 1983 (*Heck* bar).  This application of *Heck* would create a **legal impossibility**, leaving a constitutional injury without a federal remedy, which is contrary to the remedial purpose of § 1983. *See Spencer v. Kemna, 523 U.S. 1 (1998)*. [17]

4. **The Bifurcated Court System Creates a Jurisdictional Nullity and Mandates Federal Review**

---

[17] Although the Court held that Spencer's habeas petition was moot, Justice Souter's concurrence (joined by three others) reiterated his position from Heck, emphasizing that the bar should not apply to former prisoners who cannot seek habeas relief.

The argument for legal impossibility is compounded by the structural failings of the state court system. Plaintiff's inability to obtain a corrective measure in the Oklahoma court system is not merely procedural but **structural**, further demonstrating the **legal impossibility** of exhausting state remedies. This institutional failure stems from **Oklahoma's Bifurcated Courts of Last Resort** (the Oklahoma Supreme Court and the Oklahoma Court of Criminal Appeals).

The fundamental constitutional crisis is highlighted by the challenge to the underlying legislative intent and subsequent application of the criminal statute:

> "It can further be argued that **21 O.S. § 711** also violates **Article 5, Section 59 of the Oklahoma Constitution** prohibiting Special Purposes laws, in that its sole purpose is to **arbitrarily and capriciously disarm law abiding private citizens** who have shown that they will use firearms outside of the home, *see* **21 OK Stat § 1289.2 (2004)**, by arbitrarily and capriciously and on a case-by-case basis based on the expressed legislative finding of: "controlling the use of firearms, and of prevention of their use, **without unnecessarily denying their lawful use in defense of life, home, and property.**" (Emphasis added)." (Amended Complaint ECF Doc. No. 28, filed Oct. 4, 2025, at 14, Count 4(e)).

This challenge asserts that the statute, as applied, operates as a **Special Law** (violating Art. V, § 59 Okla. Const.) because it does not operate uniformly upon the citizenry but arbitrarily targets and disarms individuals who attempt to exercise their constitutional right to self-defense outside the home.

Due to the fact that Oklahoma has a Bifurcated Court of last resort, there is no single, unified corrective measure to address this Complaint in the Oklahoma Courts, leading to a state of **ununiformed and contradictory results of binding statewide precedent**:

- **The Jurisdictional Nullity:** A constitutional challenge to the legislative power (Article 5, Section 59 Okla. Const.) is a matter of general law for the **Oklahoma Supreme Court**, while the challenge to the criminal conviction is a matter for the **Oklahoma Court of Criminal Appeals (OCCA)**.

- **The Judicial Hot Potato:** Simply because both the Oklahoma Court of Criminal Appeals and the Oklahoma Supreme Court will **maliciously avoid the issue through a proverbial case of "judicial hot potato"** by both courts refusing jurisdiction and citing the other as the proper forum.

This internal jurisdictional conflict creates an **unavailability of a state-court remedy** that excuses exhaustion.

5. **The Hellish Choice: The Heck Bar constitutes judicial overreach that nullifies Congressional Intent and erodes Civil Rights Law.**

The State Defendants urge this Court to apply the *Heck v. Humphrey* bar in a manner that creates a vicious, unconstitutional dilemma for the Plaintiff: the *Heck* bar prevents him from using the Congressionally-mandated remedy, and his released status prevents him from using the Habeas remedy. This is not the proper result of judicial interpretation; it is a judicial creation of a right without a remedy that: **(1) constitutes an unconstitutional encroachment on Congressional authority; and (2) incentivizes state actors to commit intentional civil rights violations.**

a. **Heck's Nullification of Violates the Separation of Powers**

Congress enacted 42 U.S.C. as a broad, general, and immediate federal remedy for any person deprived of their constitutional rights under color of state law. The statute's plain language contains no exhaustion requirement and provides no exception for individuals who cannot access the Habeas statute, 28 U.S.C. .

In applying *Heck* to a non-custodial plaintiff, the Supreme Court's ruling, as interpreted by the Defendants, does not merely regulate the timing of a claim—it annuls a substantive, congressionally-granted remedy for an entire class of citizens. As **Justice Souter** observed, a

27

former prisoner "may bring a action establishing the unconstitutionality of a conviction or

confinement without being bound to satisfy a favorable-termination requirement that it would be

impossible as a matter of law for him to satisfy" (*Spencer v. Kemna*, 523 U.S. 1, 21 (1998)

(Souter, J., dissenting)).

This act goes beyond permissible judicial interpretation and represents an

unconstitutional encroachment on the legislative branch . By making the remedy contingent on

access to an entirely different, unavailable statute (§ 2254), the Judiciary effectively repeals for a

class of citizens based solely on their release from custody. As Souter stated in the original

opinion, the Court should have simply "treat[ed] a action as good on its face" unless the plaintiff

was currently in custody and able to file a habeas petition (*Heck v. Humphrey*, 512 U.S. 477, 491

(1994) (Souter, J., concurring in judgment)).

**b. The Heck Bar, as Applied, Creates a "Shield" for Intentional Civil Rights Violations**

The most pernicious consequence of applying the *Heck* bar to released prisoners is the

intentional incentivizing and shielding of civil rights violations by state actors. A strict

application of *Heck* effectively tells state officials: **The end justifies the means.**

If a state actor (police, prosecutor) secures a conviction, even through constitutional

violations (e.g., using a law later declared substantively void by *Bruen*), that actor is permanently

immunized from damages once the plaintiff serves his time and is released.

The state actor is rewarded for violating the Constitution, because the very conviction

that constitutes the injury is converted into the shield that protects the wrongdoer.

For state actors prone to civil rights violations, the most effective defense is ensuring the

victim serves their sentence and is released, thereby permanently destroying the only federal

forum that could hear the case and assign accountability.

This perverse outcome cannot be what the Supreme Court intended, nor can it be constitutionally acceptable. Plaintiff's claims must therefore be permitted to proceed, not simply to vindicate his personal rights, but to preserve the remedial integrity of and protect against the systemic erosion of federal constitutional protections.

**C. The Heck Bar is Satisfied Because All Post-Conviction Remedies Have Been Exhausted and Denied on Procedural Grounds**

Defendants who invoke Heck v. Humphrey to dismiss the instant § 1983 claims misapprehend its core purpose. Heck requires a civil plaintiff to obtain a favorable termination of the conviction if the civil suit would 'necessarily imply' its invalidity.

Here, the federal collateral attack on the conviction has already run its course and failed procedurally. The District Court for the Northern District of Oklahoma, in its Opinion and Order Denying Habeas Corpus, denied the petition for a writ of habeas corpus and denied the motion to amend the petition to include the Second Amendment claim, finding the latter time-barred (See Exhibit B, p. 19-20).

Crucially, the federal court never reached the merits of the Second Amendment/Constitutional claim. All attempts to challenge the conviction directly through the proper channels—habeas corpus—are now definitively procedurally barred under the Antiterrorism and Effective Death Penalty Act (AEDPA) and its successive petition rules. To hold that the Heck bar prevents this D.C. civil suit from going forward would be to hold that the Plaintiff has no remedy whatsoever to challenge the federal agency's reliance on a conviction based on an arguably unconstitutional application of a state statute.

The Court must find that Heck's requirement is procedurally satisfied by the finality and closure of the habeas corpus process. The D.C. court is not asked to vacate the state judgment,

but to issue a declaratory judgment concerning the unconstitutionality of the underlying statute's application as a necessary prerequisite to review the FCC's independent federal administrative action. This is the only forum remaining for the Plaintiff's Article III injury.

### D. Absolute Prosecutorial Immunity is Stripped by Ultra Vires Conduct

The State Defendants' strongest shield—Absolute Prosecutorial Immunity—must fail because the complaint alleges the DAs acted without legal authority.  State Defendants Behenna and Kunzweiler are not protected by absolute immunity because their actions went beyond the "traditional role of the advocate" and entered the realm of **administrative and investigative misconduct.**

1. **The "Double Standard" (Exhibit I):** The prosecution's decision to charge Plaintiff with a felony while affording a similarly situated individual a misdemeanor for nearly identical conduct (the Ronald Lee Littles Jr. case) demonstrates an improper, discriminatory motive.

2. **Malicious Intent and Knowledge (Exhibit J):** Plaintiff was a peace officer applicant at the time of the incident. The DAs' decision to disregard clear mitigating factors and sworn statements regarding self-defense—while delaying the charge for a full year—points to a "rushed" and *ultra vires* attempt to secure a conviction regardless of the law.

3. **Pattern of Misconduct (Exhibit K):** The ethics complaints filed against DA Kunzweiler by the Fraternal Order of Police highlight a documented pattern of "rushing to file" charges for political or improper purposes.  Under *Ex parte Young*, state officials lose their immunity when they exercise their authority in a manner that conflicts with the supreme authority of the United States Constitution.

4. **The Ultra Vires Allegation:** The complaint specifically alleges that District Attorney Kunzweiler was **legally and ethically barred from continuing the prosecution due to a**

**change in state law (ECF Doc. 28 at 16, Count 6(a))**. The prosecutor's **ultra vires** conduct is confirmed by his own alleged public admission: he stated he was **"under no obligation to consider the legislative intent"** of the immunity statute until the United States Supreme Court ruled otherwise (ECF Doc. 28 at 16, Count 6(a)).

This shocking admission is **irrefutable evidence** that the prosecutor acted with deliberate indifference to the very laws intended to limit the scope of his power, thereby demonstrating the subjective bad faith and willful misconduct necessary to strip Absolute Immunity. An act taken by a prosecutor that they are legally barred from taking is not a protected "advocacy function," but an act taken **ultra vires** (beyond the legal authority of the office).

5. **Administrative Misconduct:** When a prosecutor acts *ultra vires*, they are stripped of their Absolute Immunity. The continued prosecution, therefore, constitutes **unprotected administrative misconduct of enforcement**, forcing the DAs to defend the **legal interpretation and application** of the state law that allegedly barred the prosecution **(ECF Doc. 28 at 16, Count 6(a); citing 21 O.S. § 1289.25(D) & (F)).**

6. The DAs allegedly continued the prosecution even though a change in state law legally and ethically barred them from doing so **(ECF Doc. 28 at 16, Count 6(a)).** The severity of this action—which necessitated the Plaintiff to request a report and recommendation from this Court, referring Defendant Kunzweiler to the Oklahoma Supreme Court for professional and ethical misconduct, with a recommendation for permanent disbarment or, in the alternative, his "voluntary resignation in lieu of discipline" (citing State ex rel. Okla. Bar Ass'n v.

Kinsey, 2009 OK 31, ¶ 15) [18]—demonstrates that the DA's conduct was ultra vires **(see also ECF Doc. 15 at 4, Decl. 7 & Fn. 3, *denied by minute order*); *but see* ECF Doc. 28 at 16– 18, Counts 6 & 7 (re-pled claims of misconduct and request for equitable relief)**.

The DAs' conduct is not merely an error of law but a demonstrated **unconstitutional application of law with an evil eye and an unequal hand** (*Yick Wo v. Hopkins*, 118 U.S. 356, 373–74 (1886)). The **trial prosecutor's malicious intent** was confirmed on the record and acknowledged by the OCCA when the court noted the prosecutor's argument asking the jury to **'take away Cowan's badge by convicting him' (ECF Doc. 6-3 at 6, fn. 4)**. The prosecution's unconstitutional motive—as evidenced by the Judicially Noticed Information's focus on the 'deadly weapon'—was to punish and deter the exercise of a fundamental Second Amendment right, not to enforce a neutral criminal statute. An action driven by this motive constitutes a demonstrated unconstitutional application of law with an 'evil eye' and strips the DAs of their Absolute Immunity. This professional malice occurred despite the fact that the Plaintiff was investigated and formally cleared of any professional negligence regarding his license by the appropriate licensing authority (ECF Doc. 28 at 16, Count 6(a)). This targeted, professional injury confirms that the DAs' motive was not neutral law enforcement, but the infliction of a professional punishment, which strips their absolute immunity under the Ex Parte Young doctrine." Furthermore, defense counsel at the time stated the case reflected a **'double standard'** and that the Plaintiff 'would not have been charged at all if he had been a Tulsa police officer' (**Exhibit J at 10**). This targeted, professional injury confirms that the DAs' motive was not neutral law enforcement, but the infliction of a professional

---

[18] This is absolutely necessary to "protect the interests of the public and to preserve the integrity of the courts and legal profession", State ex rel. Okla. Bar Ass'n v. Kinsey, 2009 OK 31, ¶ 15, 212 P.3d 1186, 1192,

punishment, which strips their absolute immunity under the *Ex Parte Young* doctrine."

The severity of this misconduct is confirmed by the existence of a similarly situated Black defendant, who was treated with extreme leniency by the same prosecutor's office. Specifically, in the case of **Ronald Lee Littles Jr.**, a Black security guard who deliberately fired a weapon at (and missed) a suspended student in Tulsa County, the District Attorney charged him with a **misdemeanor** (*Recklessly Handling a Firearm*) that was ultimately dismissed after one year of probation. This contrasts starkly with the Plaintiff, a White combat veteran who claims self-defense, who was prosecuted for a **felony** (*Manslaughter*) and sentenced to **four years in prison** and ten years of violent offender registration.

This selective and disproportionate treatment provides the **"clear evidence"** of both **discriminatory effect and intent** needed to sustain the Plaintiff's claim that his prosecution was motivated by impermissible racial considerations **(Exhibit I; *see United States v. Armstrong*, 517 U.S. 456, 465 (1996))**.

7. An act taken without legal authority is considered unprotected administrative misconduct of enforcement, not a protected "advocacy function," thereby stripping them of Absolute Immunity.

8. **Independent Justification for Judicial Referral**: Failure of State Accountability Mechanisms (*Yick Wo* and *Ultra Vires* Pattern). The issuance of a permanent injunction and the referral of Defendant Kunzweiler to a disciplinary body is independently required because the Plaintiff has demonstrated the **failure of the state's internal accountability mechanisms** and a pattern of **discriminatory enforcement** that strips him of absolute immunity.

a. **The State's Refusal to Self-Correct Justifies Federal Intervention**

The Plaintiff's attempt to seek accountability through the proper state channels has proven futile. The Oklahoma Bar Association (OBA) has a documented history of declining to investigate ethics complaints filed against Defendant Kunzweiler, even when the complaints are brought by other law enforcement entities (e.g., the Tulsa Fraternal Order of Police).

- As evidenced by **Exhibit K**, the OBA declined to look into a high-profile ethics complaint against Kunzweiler, instead advising the complainant to "speak to the Oklahoma Attorney General."

- This pattern of **deflection and refusal to investigate** demonstrates that the State Bar is an ineffective forum for accountability against the District Attorney. This failure of the state's internal system justifies the **Supremacy Clause authority** of this Court to intercede by ordering a Judicial Referral for disciplinary action, as the Plaintiff is left without a state remedy for the State Defendant's continued alleged ethical and legal misconduct.

**b. The Yick Wo Doctrine: Enforcement with an "Evil Eye and an Unequal Hand"**

The Plaintiff has demonstrated that the Manslaughter Statute, 21 O.S. § 711, is applied with a discriminatory effect and intent that violates the Equal Protection Clause, further stripping the DA of immunity under *Yick Wo v. Hopkins, 118 U.S. 356 (1886)*.

- **Discriminatory Pattern:** Defendant Kunzweiler has a history of selectively enforcing the Manslaughter Statute, particularly by **aggressively pursuing the highest felony charge (Manslaughter)** in self-defense cases where the defendant is White and the deceased is Black (e.g., the high-profile Betty Shelby case, cited in **Exhibit K**), [19] while concurrently offering **extreme leniency** in cases where a Black defendant committed a

---

[19] It needs to be noted that Plaintiff is also White and his assailant (..i.e. the deceased) was Black.

similar or more egregious offense (e.g., the *Ronald Lee Littles Jr.* case, charged as a misdemeanor and dismissed, cited in **Exhibit I**).

- **Targeting Protected Conduct:** The charging pattern and the focus on the "deadly weapon" (a fact subject to Judicial Notice) confirm that the DA's motive was to **punish and deter the exercise of the Second Amendment right to armed self-defense**, not to neutrally enforce homicide laws.

- **Stripping Immunity:** An action driven by this **demonstrated unconstitutional application of law with an 'evil eye'** is not a protected advocacy function. This pattern of **selective enforcement** constitutes willful, malicious misconduct that strips the DAs of their Absolute Immunity and meets the standard for an ethical investigation into potential bias and professional dereliction.

This institutional failure, confirmed by the OBA's refusal to act, mandates that this Court use the Judicial Referral process to preserve the remedial integrity of and protect against the systemic erosion of constitutional rights.

**E.  Qualified Immunity Is Inapplicable**

Should this Court determine that the State Defendants' conduct falls short of Absolute Prosecutorial Immunity (API), they must still satisfy the two-pronged test for **Qualified Immunity (QI)**. The motion to dismiss the damages claims against the State Defendants in their individual capacities must be denied because: 1) the Complaint alleges facts establishing a violation of the Plaintiff's constitutional rights; and 2) those rights were **"clearly established"** at the time of the alleged violation. Hence, Qualified immunity protects officials only when their conduct does not violate "clearly established" rights.

**1. The Right to Self-Defense is Clearly Established:** The right to defend one's life with a firearm is the "central component" of the Second Amendment (*Heller*, *McDonald*, *Bruen*).

**2. No Reasonable Officer Exception:** No reasonable prosecutor could believe that maintaining the validity of a conviction based on an unconstitutional "duty to retreat" standard—and using that conviction to permanently bar a federal license—is consistent with the Supremacy Clause.

**3.  The Complaint Alleges Facts Demonstrating a Constitutional Violation**

To defeat the first prong of QI, the Plaintiff must allege facts showing a violation of a constitutional right.  The preceding section demonstrated that the DAs' conduct was *ultra vires* and driven by an unconstitutional motive, piercing the API shield.  This same conduct satisfies the first prong of the Qualified Immunity test:

- **Equal Protection Violation (Selective Enforcement):** The Complaint alleges that the DAs subjected the Plaintiff to a felony prosecution while a similarly situated Black defendant, who fired a weapon at a student, was charged with a misdemeanor that was later dismissed (ECF Doc. 28 at 16, Count 6(a)).  This selective and disproportionate treatment, confirmed by trial counsel's on-the-record statement that the Plaintiff was targeted, provides the requisite **discriminatory effect and intent** to sustain a claim under the Equal Protection Clause.

- **Due Process Violation (Malicious and Ultra Vires Prosecution):** The allegation that the DA was legally and ethically barred from continuing the prosecution due to an immunity statute, and publicly stated he was "under no obligation to consider the legislative intent," constitutes a violation of substantive due process (ECF Doc. 28 at 16, Count 6(a)).  A prosecution that a prosecutor is legally barred from pursuing is a violation

of the fundamental right to be free from arbitrary, malicious, and *ultra vires* government action.

### 4.  The Constitutional Rights Were Clearly Established

To defeat the second prong of QI, the Complaint must demonstrate that the constitutional right violated was "clearly established" at the time of the violation, such that **"every reasonable official would have understood that what he is doing violates that right."**  The DAs' alleged conduct was so egregious that it violates constitutional rights that have been clearly established for decades.

### a. The Right to Be Free from Selective Enforcement is Clearly Established

The right to equal protection under the law, and freedom from prosecution based on arbitrary or discriminatory classifications, is clearly established.  The facts alleged place the DAs' conduct outside the bounds of reasonableness:

- **The *Yick Wo* and *Armstrong* Standard:** The Supreme Court has unequivocally established that administering law with an "evil eye and an unequal hand" is a classic violation of the Equal Protection Clause (*Yick Wo v. Hopkins*, 118 U.S. 356, 373–74 (1886)).  When the facts pleaded show such an extreme disparity in treatment between two similarly situated individuals—a white veteran charged with a felony vs. a Black security guard charged with a dismissible misdemeanor—the unconstitutional nature of the action is immediately apparent.

- **The "Obvious Clarity" Exception:** Where an official's conduct is so outrageous and unconstitutional on its face—such as using the criminal justice system to inflict "professional punishment" and deter the exercise of a Second Amendment right—it is not

necessary to cite a case with identical facts. The facts themselves "make manifest the constitutional violation" to any reasonable prosecutor.

**b. The Right to Be Free from Ultra Vires Prosecution is Clearly Established**

The core of the DAs' alleged misconduct is not a mere "error of law," but a willful and *ultra vires* act that demonstrates a lack of legal authority:

- **Willful Statutory Disregard:** The allegation that the prosecutor continued a prosecution he was legally and ethically barred from pursuing, based on his own claimed lack of obligation to follow state legislative intent, demonstrates willful conduct taken **outside his legal authority** (ECF Doc. 28 at 16, Count 6(a)).

- **Fundamental Due Process:** It is clearly established that a government official who acts *ultra vires* and without any legal authority cannot claim the protection of immunity, as such action violates the fundamental component of Due Process: that the government must act pursuant to law.  A reasonable prosecutor would have known that continuing a legally barred prosecution to satisfy a malicious motive would violate the Plaintiff's clearly established constitutional rights.

**Therefore, because the Complaint plausibly alleges both a clear constitutional violation and that this violation was clearly established, the individual State Defendants are not protected by Qualified Immunity, and the claims for monetary damages must survive the motion to dismiss.**

## V.  ALTERNATIVE RELIEF: IF *HECK* IS FOUND APPLICABLE, ALL BARRED CLAIMS MUST BE STAYED

Should this Court determine that **any claim** that implies the invalidity of the Plaintiff's conviction—specifically **Counts 5, 6, 7, 8, and 9**—is currently barred by the ***Heck v. Humphrey***

doctrine, the Plaintiff respectfully requests that the Court exercise its **inherent equitable authority** to **STAY** adjudication of those claims, rather than dismiss them without prejudice.

This inclusive approach is necessary because Counts 5 and 9, like Counts 6, 7, and 8, are integrally linked to the finality of the conviction and its subsequent use against the Plaintiff. This procedure maintains **judicial economy** and preserves the Plaintiff's full remedial right should the legal foundation of the conviction be removed by this litigation.

## A.  The Hellish Choice: The *Heck* Bar Constitutes Judicial Overreach that Nullifies Congressional Intent and Erodes Civil Rights Law

The State Defendants urge this Court to apply the *Heck v. Humphrey* bar in a manner that creates a vicious, unconstitutional dilemma for the Plaintiff: the *Heck* bar prevents him from using the Congressionally-mandated **§1983** remedy, and his released status prevents him from using the Habeas remedy.  This is not the proper result of judicial interpretation; it is a judicial creation of a right without a remedy that: (1) constitutes an unconstitutional encroachment on Congressional authority; and (2) incentivizes state actors to commit intentional civil rights violations.

### 1.  *Heck's Nullification Violates the Separation of Powers*

Congress enacted **42 U.S.C. § 1983** as a broad, general, and immediate federal remedy for any person deprived of their constitutional rights under color of state law. The statute's plain language contains no exhaustion requirement and provides no exception for individuals who cannot access the Habeas statute, 28 U.S.C. § 2254.

In applying *Heck* to a non-custodial plaintiff, the Supreme Court's ruling, as interpreted by the Defendants, does not merely regulate the timing of a claim—it **annuls a substantive, congressionally-granted remedy** for an entire class of citizens.  As Justice Souter observed, a

former prisoner "may bring **§1983** action establishing the unconstitutionality of a conviction or confinement without being bound to satisfy a favorable-termination requirement that it would be impossible as a matter of law for him to satisfy" (*Spencer v. Kemna*, 523 U.S. 1, 21 (1998) (Souter, J., dissenting)).

This act goes beyond permissible judicial interpretation and represents an **unconstitutional encroachment on the legislative branch**.  By making the remedy contingent on access to an entirely different, unavailable statute, the Judiciary effectively repeals **§1983** for a class of citizens based solely on their release from custody.  As Justice Souter stated in the original opinion, the Court should have simply "treat[ed] a **§1983** action as good on its face" unless the plaintiff was currently in custody and able to file a habeas petition (*Heck v. Humphrey*, 512 U.S. 477, 491 (1994) (Souter, J., concurring in judgment)).

## 2. The Heck *Bar, as Applied, Creates a "Shield" for Intentional Civil Rights Violations*

The most pernicious consequence of applying the *Heck* bar to released prisoners is the intentional incentivizing and shielding of civil rights violations by state actors.  A strict application of *Heck* effectively tells state officials: **The end justifies the means.**

If a state actor (police, prosecutor) secures a conviction, even through constitutional violations (e.g., using a law later declared substantively void by *Bruen*), that actor is permanently **immunized from damages** once the plaintiff serves his time and is released.  The state actor is rewarded for violating the Constitution, because the very conviction that constitutes the injury is converted into the shield that protects the wrongdoer.

For state actors prone to civil rights violations, the most effective defense is ensuring the victim serves their sentence and is released, thereby permanently destroying the only federal forum that could hear the case and assign accountability.

40

This perverse outcome cannot be what the Supreme Court intended, nor can it be constitutionally acceptable.  Plaintiff's claims must therefore be permitted to proceed, not simply to vindicate his personal rights, but to preserve the remedial integrity of **§1983** and protect against the systemic erosion of federal constitutional protections.

**B.  Judicial Economy and Equity Compel a Stay Pending Resolution of Count 4**

If the Court finds that the *Heck* bar applies to any of the claims, the equitable remedy is a stay, not dismissal, due to the unique circumstance of **Count 4 (Facial *Bruen* Challenge)**.

- **Curing the Defect: Count 4** is the strongest claim to survive *Heck* because it attacks the underlying statute.  A favorable ruling on Count 4 would effectively **invalidate the conviction** by removing its legal basis, thus satisfying the favorable termination requirement and **automatically rendering the *Heck* bar inapplicable** to the dependent claims.

- **Count 5 (Selective Prosecution):** Success on Count 4 fundamentally alters the legal landscape of the initial injury, greatly strengthening the claim that the prosecution was pursued with a discriminatory purpose against a constitutional right.

- **Count 9 (*Monell* Liability):** This claim is entirely **derivative** of the constitutional violations alleged in Counts 5, 6, 7, and 8.  If the underlying constitutional injury is cured, the *Monell* claim is no longer barred by *Heck* and must be allowed to proceed.

- **Conserving Judicial Resources:** Granting a stay is the most efficient administrative tool, aligning with the Court's mandate for **Judicial Economy** (Fed. R. Civ. P. 1).  Dismissing these claims would force the Plaintiff to **refile an identical lawsuit** upon a successful resolution of Count 4, imposing the administrative burden of new process, new motions,

and new briefing on the Court and the State Defendants, which constitutes an

unnecessary waste of resources.

- **Encouraging Global Resolution:** By staying the claims, the Court avoids fragmentation
  and keeps all potential liabilities on the docket. This acts as a powerful incentive for the
  State Defendants to consider a **global resolution** of the entire controversy, an outcome
  strongly favored by this Court (Standing Order 11 , at 8).

**CONCLUSION:** Plaintiff requests that, if any of Counts 5, 6, 7, 8, or 9 are found to be currently

applicable to the *Heck* bar, the Court exercise its inherent equitable powers to **STAY** the

adjudication of those claims pending the final resolution of Count 4.

## VI.  ARGUMENT AGAINST FEDERAL DEFENDANT: RIPENESS IS MET AND DEFERENCE IS OVERRULED

The FCC's motion to dismiss based on Ripeness (or lack of a final agency action under

the APA) fails because the agency's action is final, has caused a present injury, and its legal

defense has been gutted by the Supreme Court.  The FCC's evaluation of the Plaintiff's past

felony was arbitrary and capricious.  The Plaintiff provided a detailed, sworn statement to the

Commission, fully laying out the facts of the self-defense claim, the evidence of his professional

conduct, and documentation demonstrating the mitigating nature of the felony (**Exhibit J**).  The

Commission's subsequent action failed to adequately account for these documented mitigating

factors, including the evidence of prosecutorial double standards (**Exhibit J** at 10), thus

rendering the denial of his application a violation of the APA.

### A.  The FCC's Action is Final and the Claims are Ripe

1. **Final Agency Action:** The FCC's **"character policy"** has been irrevocably applied to
   the Plaintiff.  The denial of his application, or the indefinite deferral based on a policy

that views his conviction as a permanent bar, constitutes a definitive and **final agency action** under the APA. [20] The FCC's evaluation of the Plaintiff's past felony was arbitrary and capricious.  The Plaintiff provided a detailed, sworn statement to the Commission, fully laying out the facts of the self-defense claim and the evidence of prosecutorial double standards (**Exhibit J**).  Crucially, the Commission failed to account for the fact that the Plaintiff was **investigated and formally cleared of any professional negligence** by the licensing authority responsible for his profession (**Exhibit J at 2**).  Ignoring this professional clearance and the **prosecutor's own admission** that he acted with **willful disregard of legislative intent** (ECF Doc. 28 at 16, Count 6(a)) renders the denial of his application a violation of the APA, as the agency failed to consider an essential and documented mitigating factor that voided the conviction's legal premise.  Ignoring this official professional clearance renders the denial of his application a violation of the APA, as the agency failed to consider an essential and documented mitigating factor.

Furthermore, the FCC's reliance on the underlying state felony conviction is **arbitrary and capricious** because the agency failed to consider the **constitutional taint** of the statute itself (21 O.S. § 711) and its unconstitutional application (Count 2). The FCC's Character Policy, in this instance, penalizes Plaintiff for the exercise of his Second Amendment right to self-defense—a right violated by the state prosecution's reliance on a duty-to-retreat argument contrary to New York State Rifle & Pistol

---

[20] Plaintiff notes that the Federal Defendant's reliance on "exhaustion" is a procedural circularity; under 47 U.S.C. § 309(e), the Commission has a mandatory, non-discretionary duty to set a license for a formal hearing if it cannot grant it. By refusing to either grant the license or trigger the § 309(e) hearing, the FCC is effectively attempting to "exhaust" the Plaintiff out of his Article III right to judicial review—a tactic that strips the agency of the standard exhaustion defense.

Association, Inc. v. Bruen, 597 U.S. 1 (2022). The FCC's action, therefore, unconstitutionally impinges on Plaintiff's ability to engage in regulated First Amendment activity. The FCC's "character policy" treats the conviction as a valid, reliable indicator of the Plaintiff's fitness to obey the law ("any conviction proves a propensity to obey the law"). However, the underlying statute is facially void for vagueness, as demonstrated in Section VII.C.4, because its structure is incoherent, internally contradictory, and designed to punish the mere **use of a protected firearm** in self-defense, independent of the shooter's mental state. By relying on a conviction derived from a statute that is structurally and constitutionally infirm—a statute that criminalizes the exercise of a core constitutional right (the Second Amendment) through ambiguous terms ("unnecessarily") and the weapon used ("dangerous weapon")—the FCC entirely failed to consider the **essential constitutional reliability** of the "evidence" on which it based its denial. It is the very essence of arbitrary agency action to predicate a life-altering federal disability on a state court judgment that is tainted by a fundamental structural violation of the Due Process Clause. Therefore, the FCC's finding that the conviction proves unfitness is arbitrary and capricious under 5 U.S.C. § 706(2)(A).

**The conviction is further tainted because it was secured by state actors' failure to preserve exculpatory evidence.** The prosecution's key argument—that the Plaintiff fabricated his claim of a gun threat after the fact—was directly contradicted by the testimony of **Officer Scott Allison**, the first officer on the scene, who testified that the Plaintiff immediately reported the victim had **"threatened him"** and that it **"seemed like Mr. Cowan said the guy was going to shoot him."** (ECF Doc. 6-1 at

fn. 4).  The failure of the police detectives to document or provide this immediate, exculpatory on-scene statement to the prosecutor is a **functional *Brady* violation** that allowed the State to maliciously argue the Plaintiff was lying about self-defense.  This misconduct is compounded by the fact that the entire encounter was captured on surveillance video (**St. Exh. 32**), an objective piece of evidence that the detectives failed to provide or rely upon (ECF Doc. 6-1 at 9), further demonstrating an intent to ignore evidence supporting the claim of self-defense.

**Furthermore, the FCC failed to consider that the state conviction was secured by documented prosecutorial malice.**  The prosecutor, during closing arguments, improperly appealed to the jury to impose a federal constitutional disability, arguing they must convict the Plaintiff to **"take away the gun out of his hand."** (ECF Doc. 6-1 at 20).  He continued this malicious appeal, stating the jury should **"not send him home today with his badge and his gun, because he has forfeited the right to carry those things."** (ECF Doc. 6-1 at 21).  A conviction sought for the explicit purpose of imposing a permanent federal disability (the felon-in-possession status) constitutes unconstitutional motive and cannot serve as a reliable foundation for the FCC's "Character Qualifications." [21]

---

[21] The OCCA conceded the prosecutor's comments were an error but found the error "harmless". The subsequent Habeas Court reviewed this finding under the highly deferential AEDPA standard and found no unreasonable application of federal law. However, the Habeas Court explicitly noted that at the time of its ruling, Plaintiff "presents no new evidence" to support his claims of actual innocence and misconduct. This is the crucial distinction: the issue for this Court is not whether the prior rulings were "unreasonable" under AEDPA, but whether the State Defendants sought the conviction for an unconstitutional motive (malice) by exploiting a functional Brady violation (the Allison/Video evidence) that was not presented in the prior federal review. The issue of constitutional malice under §1983 and FCC Arbitrariness under the APA remains open, as it was never "actually and necessarily decided" on a complete record.

2. **Ripeness for Review:** The case is ripe because the issue is purely legal—whether the FCC can constitutionally apply a character policy predicated on a state conviction that itself rests upon an unconstitutional statute—and the Plaintiff suffers an ongoing, daily injury from the loss of his license and livelihood.

## B.  The Statute of Limitations Defense Fails Under Corner Post, Inc.

The Federal Defendant may assert a Statute of Limitations (SOL) defense, arguing that the Plaintiff's challenge to the decades-old Character Policy is untimely under the six-year SOL provided by the APA (28 U.S.C. § 2401(a)).  This defense must fail as a matter of law based on the Supreme Court's definitive ruling in Corner Post, Inc. v. Board of Governors of the Federal Reserve System, 603 U.S. ___ (2024).

1. **The six-year SOL** does not begin to run until the plaintiff is **actually injured** by the final agency action.  The mere promulgation of the rule, which may not affect every member of the public, does not trigger the limitations period.

2. **The Plaintiff was not injured until** the FCC applied this policy to his personal application, resulting in the constructive denial or indefinite deferral.  This specific, individualized application, dated September 29, 2023, is the operative injury date that triggered the **SOL**.

3. **Since the Plaintiff filed this action in 2024** (and the Amended Complaint in October 2025), the challenge is timely, as it falls well within the six-year window that began on September 29, 2023.  The FCC's SOL defense is therefore without merit.

## C.  The Overruling of Chevron Requires De Novo Review and Limits Skidmore Weight

The FCC is anticipated to rely on regulatory deference doctrines to defend its administrative rules.  The Supreme Court's recent ruling in ***Loper Bright Enterprises v.***

*Raimondo* (overruling *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*) fundamentally undermines the FCC's defense.

1. **De Novo Judicial Review:** The **overruling of Chevron deference** means this Court must now perform a **de novo** (from scratch) review of the relevant provisions of the Federal Communications Act.

2. **Burden of Proof:** The burden is now on the FCC to demonstrate that the **plain text** of the Communications Act clearly and explicitly delegated to the agency the specific authority it exercised in enacting the rule that the Plaintiff challenges. The Court must presume Congress retains the power to make major policy decisions, and without clear statutory delegation, the FCC's administrative rule must be deemed an overreach of authority.

3. **No Automatic Deference:** The Court's obligation is to determine the "best reading" of the statute, not to defer to the agency. While the Court may still give an agency's interpretation some "Skidmore weight" based on factors like thoroughness, validity of reasoning, and consistency, this consideration is persuasive only, not controlling.

4. **De Novo Review on Constitutional Grounds (Count 2):** The as-applied constitutional challenge in Count 2, which requires the Court to evaluate the FCC's action against the constitutional boundaries of the Second and First Amendments, mandates de novo judicial review. The Court must apply its own independent judgment on these fundamental constitutional questions and afford no deference to the agency.

5. **The Skidmore Inquiry is Preempted:** The Court should not even reach the Skidmore factors because the agency's action is prima facie barred by the Major Questions

47

Doctrine.

**D.  The FCC's Action is Barred by the Non-Delegation Doctrine and the Major Questions Doctrine (MQD) Precluding Skidmore Consideration.**

The Court must decline to afford any weight or consideration (***Skidmore***) to the Federal Communications Commission (FCC) because its asserted regulatory action is barred by fundamental constitutional principles that preclude both the delegation and the exercise of such broad power.

**1. The Non-Delegation Doctrine: A Facial and As-Applied Constitutional Challenge**

The **Non-Delegation Doctrine** is a fundamental constitutional protection that requires Congress to provide an **"intelligible principle"** to guide any administrative agency's discretion when delegating legislative power.  Plaintiff asserts both a **facial challenge** to the statute and an **as-applied challenge** to the FCC's specific application of its rule, giving the Court two independent grounds for striking the agency's action.

**a. The Facial Challenge: Lack of Intelligible Principle in 47 U.S.C. § 308(b)**

Plaintiff asserts a **facial challenge** to 47 U.S.C. § 308(b) because the statute, on its face, unconstitutionally delegates legislative authority without an intelligible principle to guide the judgment of moral character.

- The statute permits the FCC to grant licenses only upon a finding that **"the public convenience, interest, or necessity will be served thereby,"** which the agency uses to derive its power to judge **"character qualifications"**.

- This expansive and vague standard is facially defective because the intelligible principle for judging **"character"** is not constrained to the FCC's core **technical and operational competence** in regulating communications.  The

delegation is unconstitutional as it empowers the FCC to legislate on moral fitness and impose civil disabilities far outside its technical scope.

**b. The As-Applied Challenge: Unconstitutional Application to a Tainted Judgment and Protected Activity**

Even if the statute were deemed facially valid, the FCC's application of the Character Qualification standard to Plaintiff is unconstitutional **as applied**.

- The FCC applied its policy—which holds that **"any conviction"** proves a propensity to obey the law—by refusing to consider the constitutional taint of the underlying judgment (prosecutorial malice and *Brady* violations) and the underlying unconstitutional as-applied violation of the Plaintiff's Second Amendment rights (Count 2).

- By refusing to consider this taint, the FCC applied its delegated power in a manner that directly validates and furthers an unconstitutional state prosecution that infringed upon the Plaintiff's right to **self-defense** (a Second Amendment issue) based on the unconstitutional duty-to-retreat argument, a direct violation of New York State Rifle & Pistol Association, Inc. v. Bruen, 597 U.S. 1 (2022), and his ability to participate in a regulated **First Amendment activity** (Amateur Radio licensing). [22]  Specifically, the denial **permanently bars Plaintiff from engaging in regulated speech activities** essential to the hobby, including **47 C.F.R. § 97.111 (Authorized**

---

[22] The amateur radio license is a prerequisite for engaging in regulated speech. 47 C.F.R. § 97.111 authorizes the specific transmissions (i.e., communication) essential to the hobby, and 47 C.F.R. § 97.117 permits international communications. The denial of the license therefore acts as a permanent, content-neutral prior restraint on these protected First Amendment activities, demanding a higher level of scrutiny than a typical administrative action.

transmissions) and **47 C.F.R. § 97.117 (International communications)**.
The application is thus arbitrary and capricious and fails the Non-Delegation
test by acting beyond any permissible intelligible principle.

**2. The Major Questions Doctrine Confirms the Action is *Ultra Vires***

The **Major Questions Doctrine (MQD)** reinforces the Non-Delegation principle,
operating as a canon of construction that requires **clear congressional authorization**
when an agency regulates matters of "vast economic and political significance" and
constitutional dimension.

- **MQD Threshold:** The FCC's punitive action, which hinges on its subjective
  interpretation of "Character" and directly impacts fundamental constitutional
  rights (Second and First Amendments), triggers the MQD's **Clear Statement
  Rule**.

- **MQD Vitiates *Skidmore*:** Where the MQD applies, the court determines that
  Congress **never delegated the authority** in the first place.  When an agency
  acts without delegated authority, the action is ***ultra vires*** (beyond its legal
  power).  The Court cannot afford any persuasive ***Skidmore*** weight to an
  agency's interpretation of a statute when the agency is found to have legally
  crossed the outer boundary of its granted power.

**3. Conclusion**

Because the FCC cannot point to a clear statement from Congress delegating the
authority to regulate a matter involving fundamental constitutional rights, the Major
Questions Doctrine applies. Consequently, the FCC's action is ***ultra vires*** and must be
struck down, rendering any analysis under the ***Skidmore*** framework irrelevant.

### E.  The Claims Are Interdependent and Unified

The Federal Defendant's character policy acts as the second element of the unconstitutional deprivation, flowing directly from the State Defendants' enforcement of an unconstitutional statute.  The Plaintiff is caught in a legal vise: the State denies the constitutional integrity of the conviction, and the FCC uses the existence of that conviction to deny a federal right. The unifying controversy is the unconstitutional penalty imposed by the federal agency (Count 2) for the exercise of a fundamental right (Second Amendment) that was wrongfully criminalized by the state. Court must address the State claim first to properly adjudicate the federal claim and resolve the entire controversy.

### F.  The FCC's Indefinite Delay Is Unreasonable Under the TRAC Factors (APA § 706(1))

The Plaintiff seeks to compel agency action that has been **unlawfully withheld or unreasonably delayed**, pursuant to the **Administrative Procedure Act (APA), 5 U.S.C. § 706(1)**.  The FCC's indefinite stay of Plaintiff's application pending a 'change in circumstances' that the State of Oklahoma has already declared legally impossible (Exhibit A) is the definition of unreasonable delay under the APA.  This Court must resolve the underlying constitutional controversy to provide a 'path for the agency to act.' *Cohen v. Rosenstein, 578 F.3d 1, 14 (D.C. Cir. 2009)*.  The D.C. Circuit's six-factor test from *Telecommunications Research & Action Center v. FCC* (**TRAC**) compels this Court to intervene and order the Federal Communications Commission (FCC) to either issue a final, appealable denial or grant the license.  Analysis of the factors overwhelmingly favors the Plaintiff:

### 1. The time the agency takes must be governed by a rule of reason.

- The FCC has indefinitely delayed action, stating only that it is "reviewing its policies" regarding "certain types of [offenses]". This is not a delay due to administrative backlog; it is an **indefinite administrative punishment**.  An indefinite deferral gives the Plaintiff no path forward, amounts to a *de facto* denial, and inherently violates any rule of reason.

## 2. The court should consider the effect of the delay.

- The effect of the delay is not a simple administrative inconvenience; it is an **ongoing, unconstitutional injury** that is both "constitutional and administrative in nature". The FCC's inaction permanently denies the Plaintiff the ability to exercise a federal benefit based solely on a state conviction that is alleged to be unconstitutional under *Bruen* (The As-Applied Constitutional Challenge of Count 2). The delay perpetuates a constitutional harm and must be addressed.

## 3. The court should consider the effect of expediting delayed action on agency activities of a higher or competing priority (The TRAC Trap Factor).

- Factor is inapplicable and cannot shield the FCC from its duty to act.  The FCC cannot invoke a claim of "competing priorities" to justify a delay that results in the **indefinite, unconstitutional infringement of a private citizen's rights**.

- No competing administrative priority can legally outweigh the FCC's fundamental duty to follow the **Administrative Procedure Act (APA)** and the **U.S. Constitution**.

- The remedy is minimal: ordering the FCC to issue a final, appealable decision (denial or grant).  The minimal resources required to issue this decision do not constitute an overriding "higher priority" that justifies the current indefinite *de facto* denial.

**4. The court should not simply substitute its own judgment for the agency's priorities.**

- The Plaintiff is not asking the Court to substitute its judgment on **policy** (i.e., whether the Plaintiff is eligible for the license), but to compel action on a **pure question of legal duty**.  The FCC has a legal duty to either grant the license or issue a final, appealable decision.  The Court's order would only compel the FCC to fulfill its constitutional and APA duties, not to usurp its administrative function.

**5.  The agency does not have the benefit of a presumption of regularity where it has violated a statutory deadline.**

The FCC's indefinite delay is not a simple administrative oversight; it is an established pattern and practice dating back to 2017, affecting approximately 200 applications for individuals with "Person Crimes" convictions. This systemic conduct is a flagrant violation of clear statutory mandates and strips the agency of any presumption of regularity.

- **Statutory Violation:** While no specific calendar-day deadline was missed, the FCC has violated the clear statutory mandates of the Administrative Procedure Act (5 U.S.C. § 558(c)) and the Communications Act (47 U.S.C. § 309).

- **Unlawful Withholding:** The FCC's indefinite delay—a de facto denial—is an unlawful withholding of action because it violates § 558(c)'s requirement for licenses to be processed in a "timely fashion" and fails to provide the required notice.

- **Systemic Procedural Abuse (Stripping the Presumption):** More critically, the eight-year pattern of holding approximately 200 applications in perpetual limbo reveals an institutionalized strategy to bypass the mandatory procedural safeguards. By refusing to issue a formal denial, the FCC avoids the legal requirement to afford applicants formal notice and a mandatory hearing procedure required by § 309(e) before a license can be legally withheld. This intentional and sustained violation of clear statutory procedures, designed to withhold mandatory administrative remedies from a class of applicants, strips the FCC of any presumption of regularity under the fifth TRAC factor and compels this Court's immediate intervention.

**Conclusion on TRAC:** Based on the compounding constitutional injury caused by the indefinite delay, the **TRAC** factors overwhelmingly weigh in favor of the Plaintiff. The Court must compel the FCC to act immediately to end the unconstitutional *de facto* denial and allow the Plaintiff to pursue his full rights to judicial review.

## G.  Statutory Analysis: The Plain Text of 47 U.S.C. § 308(b) Violates the Non-Delegation Doctrine (Count 1)

The statutory text of **47 U.S.C. § 308(b)** is unconstitutional on its face because it fails to provide an **"intelligible principle"** to guide the agency's discretion, constituting an

impermissible delegation of legislative power and an unconstitutional imposition on the First Amendment rights of the Plaintiff.

**1. The Statute Fails the Intelligible Principle Test**

The statute mandates that a license applicant set forth facts "as the Commission by regulation may prescribe as to the **citizenship, [and] character**" of the applicant. (ECF Doc. 28 at 9, Count 1)

The Supreme Court requires that Congress, when delegating authority to an agency, must "lay down by legislative act an **intelligible principle** to which the person or body authorized to [act] is directed to conform." *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928). In the context of broadcasting, the accompanying "shall issue" provision requires the FCC to grant a license if it finds "that the public interest, convenience, and necessity would be served." 47 U.S.C. § 309(a).

The terms "citizenship" and "character" in **§ 308(b)**, when divorced from any concrete, technical, or financial standard, are nothing more than a delegation of **unfettered legislative authority** to create public policy, which Congress alone is empowered to make.

- **"Character":** The term is inherently limitless and subjective. It allows the agency to import public morality, social ideology, or political acceptability as criteria for First Amendment activity. This is an unconstitutional delegation, especially as applied here, where the FCC is using a conviction for a state-law felony to perpetually bar a citizen from federal licensure—a matter that goes far beyond determining technical qualifications for radio wave transmission.

- **"Citizenship":** While seemingly simple, using citizenship to deny access to a First Amendment medium without an overwhelming national security justification transforms the

licensing process into a legislative determination of who is politically worthy to speak. The statute provides no limiting criteria or clear guidelines on the *degree* or *manner* in which citizenship is to be a factor, rendering the principle unintelligible and thus unconstitutional.

## 2. The Delegation Infringes on the First Amendment

When a statute delegates discretion over speech-related activities, the Non-Delegation Doctrine is applied with **"a particularly rigorous look"** to prevent agencies from suppressing disfavored ideas. *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944). Where the statutory scheme allows an agency to regulate speech based on vague "character" or "fitness" standards, it creates an environment ripe for **viewpoint discrimination** and a chilling effect on speech.

The vagueness in **§ 308(b)** gives the FCC, a government entity, the power to pass judgment on a citizen's moral and political suitability to participate in regulated speech. This runs directly counter to the First Amendment's core purpose of protecting "uninhibited, robust, and wide-open" debate.

By allowing the FCC to rely on an indefinite and vague "character" standard based on an underlying, potentially unconstitutional, state-level conviction, Congress has delegated an **unconstitutional veto power** over the Plaintiff's ability to engage in a federally regulated First Amendment activity. The lack of clear standards in the statute itself is the source of the constitutional injury.

## 3. The Statute Is Barred by the Major Questions Doctrine

Alternatively, and as argued in Section D, the **Major Questions Doctrine (MQD)** precludes the FCC from asserting the authority to use the vague "character" provision to effect a wholesale ban on a class of speakers. MQD requires Congress to speak **clearly** when delegating authority of vast economic or political significance. *West Virginia v. EPA*, 597 U.S. 697 (2022).

Here, the FCC's interpretation of **§ 308(b)** as granting it authority to perpetually bar citizens from licensed communication based on *non-technical* character grounds, especially those involving state criminal convictions, is an assertion of **vast political and constitutional significance**. Congress did not clearly delegate to the FCC the legislative power to determine general public morality or to establish a permanent class of "unfit" speakers. Therefore, the statute, as written and as interpreted by the FCC, is an unconstitutional legislative overreach, subject to **de novo** judicial review, and must be struck down.

### 4. The Character Policy Exceeds the FCC's Chartered Authority under Title 47

The Federal Defendants' reliance on the FCC's "Character Policy Statement" to indefinitely hold or deny the Plaintiff's license constitutes an unlawful expansion of the Commission's limited statutory authority, violating the **Non-Delegation Doctrine** by venturing into matters reserved exclusively for Congress.

### The FCC's Limited and Specific Charter

The **chartered role** of the Federal Communications Commission is clearly defined by Congress. As articulated in **47 U.S.C. § 151**, the Commission exists primarily to execute and enforce the provisions of the Communications Act, which focus on **regulating the radio spectrum** and making "available, so far as possible, to all the people of the United States a rapid, efficient, Nation-wide, and world-wide wire and radio communication service."

In the context of licensing, Congress confined the FCC's authority:

- **47 U.S.C. § 308** requires an applicant to set forth facts "as the Commission by regulation may prescribe as to the citizenship, [and] character," but the **legislative purpose** of this section, when read *in pari materia* with the rest of Title 47, is to enable the Commission to

establish qualifications related to the **technical, training, and ethical operational conduct** of the licensee, specifically concerning the operation of the radio station being sought.

**The Unlawful Expansion of "Character" into Public Policy**

The Plaintiff's claim requires further development and briefing on the violation of the **Non-Delegation Doctrine** because the FCC's broad "Character Policy Statement" is an attempt to expand its technical and operational mandate into issues of **Public Policy and associated gate-keeping duties** that are reserved exclusively to the United States Congress.

- **Lack of Explicit Authority:** Congress did not grant the Commission **explicit authority** in **47 U.S.C. § 303** or elsewhere to use the vague term "character" to create a policy statement that acts as a **permanent moral and political ban** on a class of speakers based on unrelated state-level criminal history.

- **Usurping Legislative Power:** By using **§ 308(b)** to justify excluding individuals with "person crimes" (like murder and manslaughter) or other felonies (as referenced in the initial Count 1 analysis), the FCC is not regulating the *spectrum* or the *technical qualifications* of the radio operator; it is legislating on **who is morally fit to be a communicator** in a democracy. This policy choice—determining which state criminal offenses disqualify a citizen from a federal benefit involving First Amendment activity—is a **major question** that only Congress can determine.

- **Non-Delegation Violation:** The FCC's action is not a mere interpretation of ambiguous text; it is the **creation of public policy** using an unconstitutionally vague statutory term ("character"). This amounts to an **unlawful delegation** of core legislative functions, thereby mandating that this Court review the policy **de novo** and ultimately hold that the relevant

portion of **47 U.S.C. § 308(b)** is unconstitutional as an unlawful delegation of legislative authority.

**Conclusion:** This unified analysis demonstrates that the Federal Defendants' assertion of non-finality and deference is legally untenable. The FCC's indefinite delay, based on an unconstitutional precondition, constitutes a final agency action that is ripe for judicial review under the APA. Furthermore, the agency's reliance on 47 U.S.C. § 308(b) and its related "Character Policy" is an unlawful assertion of legislative power. Because the statutory text fails to provide an intelligible principle to guide its discretion—and because the policy expands the FCC's limited technical charter into forbidden areas of public morality and gate-keeping functions reserved exclusively for Congress—the Commission has violated the Non-Delegation Doctrine and the Major Questions Doctrine. This Court must therefore exercise its Article III jurisdiction, compel agency action that is unlawfully withheld, and ultimately strike down the unconstitutional statutory provision that stands as a perpetual barrier to the Plaintiff's exercise of their regulated First Amendment rights.

## H. The *Ex Parte Young* Doctrine Precludes the Application of the *Heck* Bar to Ongoing Federal Licensing Injuries.

The Federal Defendant's reliance on the *Heck* bar is fundamentally flawed because it ignores the core principle of ***Ex parte Young***, 209 U.S. 123 (1908). While *Heck* limits civil rights claims that seek retroactive relief or damages, it does not bar claims seeking **prospective injunctive relief** to halt an ongoing violation of federal law.

1. **Ongoing Federal Injury:** The FCC's current and indefinite deferral of Plaintiff's amateur radio license constitutes a present-day suppression of First and Second

Amendment rights.  This is a "living" constitutional injury that exists independently of

the finality of the state court judgment.

2.  **Enjoining the Effect, Not the Event:** Plaintiff is not seeking money for the 2005 trial.

Plaintiff is seeking to enjoin the **ongoing collateral effect** of that conviction—the federal

licensing bar.  Under the Supremacy Clause, a state action (the conviction) cannot be

used as an eternal shield to justify a federal agency's continued violation of a citizen's

constitutional liberties. [23]

3.  **The Necessary "Bridge":** Because the Oklahoma courts have signaled that state

remedies are "exhausted" (See **Exhibit A**), the *Ex parte Young* doctrine provides the only

remaining "procedural bridge" to allow this Court to address the unconstitutional

"Character Policy" being enforced by the FCC today.

## VII.  PLAINTIFF'S DUAL CONSTITUTIONAL CHALLENGE TO THE OKLAHOMA MANSLAUGHTER STATUTE

The Plaintiff's constitutional challenge to the Oklahoma Manslaughter statute, **21 O.S. §
711**, is mandatory for this Court to address. The statute is unconstitutional on dual grounds: it is

substantively void under the **Second Amendment** and the ***Bruen*** historical test for imposing an

unconstitutional "duty to retreat," and it is facially void for **vagueness** under the Due Process

Clause. The State Defendants' Motion to Dismiss, based on the **Heck v. Humphrey** bar, must be

---

[23] *See Wilkinson v. Dotson*, 544 U.S. 74, 82 (2005) (explaining that *Heck* does not bar actions
where "the relief sought... would not necessarily spell speedier release" or necessarily invalidate
the conviction, but rather challenges the **procedures** or **collateral bars** used to deny a federal
benefit). *See also Vann v. Kempthorne*, 534 F.3d 741, 750 (D.C. Cir. 2008) (confirming that the
*Ex parte Young* doctrine allows suits against officials to reach a "straightforward inquiry into
whether the complaint alleges an ongoing violation of federal law and seeks relief properly
characterized as prospective").

denied because its application here would unconstitutionally render the Second Amendment a **second-class right** by foreclosing all avenues for vindication of a fundamental liberty.

Accordingly, the Court must exercise its Supremacy Clause authority under ***Ex parte Young*** to grant prospective declaratory and injunctive relief against the State Defendants to terminate the ongoing chilling of the Plaintiff's fundamental rights.

### A.  Summary of Plaintiff's Constitutional Claim

The Plaintiff's claim is that **21 O.S. § 711** and the related Oklahoma judicial dicta creating a **"duty to retreat"** outside the home **(citing *Ruth v. State*, 581 P.2d 919, ¶ 8 (Okla. Crim. App. 1978))** violated his Second Amendment right to armed self-defense **(Amended Complaint, ECF No. 28, at 10-11; see also Motion for Declaratory Relief, ECF No. 15, at 2– 3, Decl. 2 & 4)**.  The Plaintiff's constitutional claim is two-fold: First, that the past conviction was obtained by criminalizing an act of armed self-defense using an unconstitutional 'duty to retreat' standard.  Second, that the State's continued authority to enforce this standard **creates an *ongoing, irreparable injury* by *chilling* the future exercise of his Second Amendment right to stand his ground in self-defense**, which is a present constitutional violation that requires prospective relief against the State Defendants.

### B.  The *Bruen* Test and the *Heck* Bar

The state conviction rests upon an unconstitutional standard that criminalized the Plaintiff's exercise of his Second Amendment right to bear arms outside the home.  The constitutional viability of this claim is established by the Government's own charging document: this Court has taken Judicial Notice of the Information(ECF No. 16; Minute Order June 6, 2025), which explicitly alleges that the Manslaughter was committed *'with a... Pistol, the same being a dangerous and deadly weapon.'*  By making the use of a firearm an express element of the

felony charge, the State itself transformed this case from one of general homicide into a regulation of armed conduct that is subject to the historical scrutiny of Bruen.

The State's assertion that its application of the duty to retreat is consistent with the nation's historical tradition is fundamentally flawed. As the Plaintiff established in Section IV, the appropriate historical analogue for the right to stand one's ground is established by Brown v. United States (1921), which rejected the common law's absolute 'duty to retreat' in favor of the 'true man' doctrine. Consequently, the State's burden under Bruen is to affirmatively prove a historical parallel from the Founding or Reconstruction eras that supports its restrictive standard. The State's inability to produce a relevantly similar historical regulation to justify its local judicial dicta creates a historical anomaly that renders the restriction on armed self-defense unconstitutional. The statute, as applied to require retreat outside the home, criminalizes conduct explicitly protected by the Second Amendment.

The Plaintiff's original defense at trial centered on whether the jury instructions and prosecutor's arguments **"erroneously conveyed to the jury that he was not legally entitled to act in self-defense"** (**ECF No. 6-3, at 1, Proposition 1**; **ECF No. 6-1, at 1**).

The State, in its appellate brief, vigorously defended the jury's decision and the instructions, arguing that the evidence showed the Plaintiff's use of force was unnecessary (**ECF No. 6-2, at 13**). The prosecutor's argument, based on the Oklahoma statute, imposed a duty to retreat outside the home, a standard that is now unconstitutional under *Bruen*, making the resulting conviction unlawful (**Amended Complaint, ECF No. 28, at 10**).

**C.  The Manslaughter Statute is Facially Unconstitutional as Vague Under the Due Process Clause (Count 4)**

The Oklahoma statute is not only substantively unconstitutional under the *Bruen* historical test, but it is also **facially unconstitutional** because the language is unconstitutionally **vague** under the Due Process Clause of the Fourteenth Amendment, which incorporated the Second Amendment right to the states in ***McDonald v. City of Chicago***.

**1. The Constitutional Standard: Void for Vagueness**

A penal statute violates the Due Process Clause if it fails to give **ordinary people fair notice** of the conduct it punishes or is so standardless that it encourages **arbitrary and discriminatory enforcement**. When a statute reaches a **fundamental constitutional right** (such as the Second Amendment right to self-defense), the required standard of certainty is heightened.

**2. The Unconstitutional Term: "Unnecessarily"**

The Oklahoma Manslaughter Statute (21 O.S. § 711(3)) fails this Due Process test by criminalizing homicide when perpetrated **"unnecessarily"** while resisting an attempted crime.

- **Lack of Fair Notice:** The term "unnecessarily" is a subjective, undefined term that lacks any clear, objective measure. It forces a person of ordinary intelligence to guess whether their instantaneous decision to stand their ground during a violent attack will later be deemed "necessary" by a court. This ambiguity creates an unacceptable **chilling effect** on the constitutional right to self-defense.

- **Arbitrary Enforcement:** The lack of statutory clarity delegates the definition of "necessary" force entirely to the whim of the State's prosecutors and the discretion of the jury. This delegation allowed the State Defendants to pursue arbitrary and discriminatory

prosecution—as evidenced by the comparison to a similarly situated individual—based on their own subjective interpretation of what the Plaintiff "should" have done.

### 3. The Unconstitutional Coercion: Vagueness Enforces Retreat

The unconstitutional vagueness is the procedural mechanism by which the State enforces the substantively unconstitutional "duty to retreat." The State's judicial interpretation effectively defines the vague term "unnecessarily" to mean **"failure to retreat."**

By allowing the State to define "unnecessarily" as "failure to retreat," the statute coerces the citizen to yield their constitutional right to stand their ground in order to avoid a felony conviction. Thus, the statute's inherent vagueness violates Due Process by:

- **Penalizing a Constitutional Right** (*McDonald* and *Bruen*).

- **Facilitating Arbitrary Prosecution** (Due Process).

This dual constitutional infirmity—substantive violation of the Second Amendment and procedural violation of Due Process—mandates that the statute, as applied, be struck down by this Court.

### 4. The Structural and Internal Contradictions of § 711 Create Unconstitutional Vagueness

The facial vagueness of 21 O.S. § 711 is not limited to the single term "unnecessarily," but stems from the statute's contradictory and structurally flawed definition of First Degree Manslaughter. This flawed structure encourages arbitrary state enforcement by blurring the line between lawful conduct and a life-sentence-carrying felony.

The statute conflates highly disparate legal theories into a single, most severe category of First Degree Manslaughter (punishable by up to life imprisonment):

| Legal Theory | Culpability/Focus | Due Process Infringement on Self-Defense |
|---|---|---|
| **Heat of Passion** | High Culpability (Near-Intentional, Provoked) | The statute contains an internal contradiction by stating this applies *unless* the homicide is **excusable or** |

| Legal Theory | Culpability/Focus | Due Process Infringement on Self-Defense |
|---|---|---|
| | | **justifiable**. This acknowledges the existence of lawful self-defense, yet immediately subjects the citizen to vaguer, contradictory terms in the adjacent clauses, rendering the notice provided meaningless. |
| **Misdemeanor Manslaughter** | Low Culpability (Purely Unintentional/Accidental) | Places a purely accidental killing during a minor offense into the highest felony class (up to life imprisonment), a severity vastly exceeding the Federal model (18 U.S.C. § 1112), which classifies it as a lesser Involuntary Manslaughter. This arbitrary grading fails to give fair notice of the true gravity of the conduct. |
| **Dangerous Weapon** | Focus on Instrumentality, not *Mens Rea* | **Weaponizes a Constitutional Right**. The inclusion of killing **"by means of a dangerous weapon"** (21 O.S. § 711) as an independent basis for a First Degree charge shifts liability away from the mental state and onto the mere **protected firearm used**. This grants State Defendants the power to arbitrarily prosecute an act of lawful self-defense at the maximum felony level *solely* because the citizen exercised their Second Amendment right to use a weapon for defense. |
| **Unnecessary Resistance** | Focus on Subjective Necessity of Force | Directly penalizes acts of imperfect self-defense based on the vague term **"unnecessarily."** This provision provides no objective standard for a citizen to know at what precise moment their defensive force becomes a **First Degree Felony**, chilling the core right to stand their ground. |

This statutory structure suffers from a dual constitutional infirmity: it is structurally incoherent when compared to clear homicide classifications, and it grants State Defendants the unbridled discretion to use factors explicitly related to the exercise of the Second Amendment

(dangerous weapon and unnecessary resistance) to impose life sentences. This systemic vagueness constitutes an independent violation of the Due Process Clause.

## VIII. CLARITY ON OVERBROAD PRAYER FOR RELIEF (RULE 12(b)(6))

The State Defendants are anticipated to seize upon the language in the Amended Complaint's Prayer for Relief requesting a "Trial De Novo" and an "Acquittal as a Matter of Law" as proof that this action is a prohibited collateral attack on the final state conviction under the Heck v. Humphrey bar.

**The Plaintiff explicitly clarifies and confirms the following:**

1. **Trial De Novo:** The Plaintiff concedes that a U.S. District Court lacks the jurisdiction and authority to conduct a trial de novo or re-examine the factual record of a final state criminal judgment.  The Plaintiff does not seek a new trial on the facts of the conviction.

2. **Acquittal as a Matter of Law:** The language requesting a Declaratory Judgment of Entitlement to an "Acquittal" is an overbroad pro se attempt to articulate the ultimate relief sought in the state court forum (via Oklahoma's post-conviction procedure) after a successful federal finding.  It is not a request for this Court to issue a judgment that would retroactively vacate the conviction in violation of Heck.

3. **The True Federal Claim:** The only retrospective relief sought in this federal forum is a Declaratory Judgment that the legal principle underlying the conviction—the State's successful imposition of an absolute duty to retreat in the context of armed self-defense—is unconstitutional under the Bruen framework.

The Court is urged to treat these overbroad terms as pro se pleading errors and, if necessary, strike them from the Prayer for Relief while allowing the case to proceed on the single, unified, prospective constitutional challenge under Ex parte Young and the APA.  This surgical remedy

preserves the judicial integrity of the Heck doctrine while preventing a constitutional injury from being without a federal remedy.

**In the alternative to striking the language**, the Plaintiff respectfully requests leave of Court to file a Second Amended Complaint to surgically strike the requests for a "Trial De Novo" and a "Declaratory Judgment of Entitlement to an Acquittal as a Matter of Law" and substitute them with a clear request for a Declaratory Judgment concerning the unconstitutional principle.

## IX. THE COURT HAS PERSONAL JURISDICTION OVER THE STATE DEFENDANTS (RULE 12(B)(2))

The State Defendants' argument that this Court lacks personal jurisdiction under Rule 12(b)(2) because they are non-resident officials who lack "minimum contacts" with the District of Columbia must fail for two critical reasons: Specific Jurisdiction (The Effects Test) is satisfied, and Ancillary Personal Jurisdiction is necessary to resolve this unified federal case.

### A. Statutory Basis: The D.C. Long-Arm Statute

A federal court in D.C. can exercise personal jurisdiction over a non-resident defendant if authorized by the D.C. Long-Arm Statute (D.C. Code § 13-423) and the exercise is consistent with constitutional due process. The Statute is met because the State Defendants' conduct caused tortious injury in the District of Columbia (D.C. Code § 13-423(a)(4)).

The State Defendants, by prosecuting the Plaintiff under the challenged Oklahoma statute, took an action that was intended and highly foreseeable to trigger a punitive response by the FCC—a federal agency whose licensing and regulatory authority is centered in this district. The resulting indefinite deferral of a federal license application is an injury that directly and immediately manifests in the District of Columbia, where the agency action occurred.

**B. Constitutional Basis: Purposeful Availment via the "Effects Test"**

To meet the constitutional requirement of minimum contacts, the Court may exercise specific jurisdiction over the State Defendants under the *Calder v. Jones* "Effects Test":

1. **Intentional Action:** The State Defendants intentionally enforced the Oklahoma statute against the Plaintiff, an individual known to be an FCC license holder (or applicant).

2. **Express Aiming at the Forum:** This enforcement action was expressly aimed at interfering with the Plaintiff's **unique federal entitlement** and status as a prospective federal licensee/applicant. This action was purposefully aimed at **nullifying the Plaintiff's federal right** to apply for and hold a license, a right which is exclusively regulated and administered by the FCC, **headquartered solely in this District**. The State Defendants cannot reasonably claim ignorance that an action against an FCC-regulated licensee would impact the federal licensing process in the nation's capital, the seat of the FCC and the primary venue for its judicial review.

3. **Claim Arises from Contacts:** The Plaintiff's cause of action—a challenge to the unconstitutional enforcement and the resulting federal disability—arises directly from the very conduct by the State Defendants that created the connection to the D.C. forum.

**C. Mitigation: The Unified Case and Ancillary Jurisdiction**

As established in the introductory statement of this Opposition, Plaintiff presents a **"single, unified 'Case and Controversy'"** under Article III. The State Defendants are indispensable to the resolution of the federal constitutional question against the FCC.

- Dismissing the State Defendants for lack of personal jurisdiction would compel the Plaintiff to file two separate lawsuits—one in Oklahoma to challenge the state statute

under the *Ex parte Young* doctrine and one in D.C. to challenge the final agency action by

the FCC.

- This would lead to gross judicial inefficiency and create a significant risk of inconsistent
  adjudications regarding the constitutional status of the same underlying conviction and its
  consequences.

- Given that the D.C. court indisputably has jurisdiction over the primary Federal
  Defendant (the FCC), the interests of fairness, reasonableness, and judicial economy—
  which form the final component of the due process analysis—mandate that this Court
  exercise ancillary or pendent personal jurisdiction over the State Defendants to fully
  resolve the unified controversy (Amended Complaint, ECF No. 28, at 2–3, Jurisdictional
  Statement). The need for a complete remedy and the resolution of the unified
  controversy—which includes the potential necessity of this Court issuing a **Declaratory
  Judgment** and addressing related ethical misconduct—cannot be severed from the
  adjudication of the merits. This necessity confirms that the State Defendants are
  indispensable parties required to afford the Plaintiff full, complete, and efficient relief.
  The defense of Lack of Personal Jurisdiction should therefore be denied.

## X.  THE COURT HAS SUBJECT-MATTER JURISDICTION AND PROPER VENUE OVER THE FCC (RULE 12(B)(1) & § 1404(A) CHALLENGE)

The FCC is likely to raise two primary Rule 12(b)(1) defenses: a bar on money damages and a

claim that jurisdiction belongs exclusively to the Court of Appeals under the Hobbs Act. Both defenses

are inapplicable here.

### A. The APA Waives Sovereign Immunity for Equitable Relief

The Federal Defendant may argue that sovereign immunity bars this suit.  This defense fails

because:

1. **Waiver for Non-Monetary Relief:** 5 U.S.C. § 702 of the Administrative Procedure Act (APA) provides a general waiver of the United States' sovereign immunity for any action seeking relief "other than money damages."

2. **Relief Sought is Equitable:** The Amended Complaint explicitly seeks only declaratory and injunctive relief—specifically, an order compelling the FCC to cease its indefinite deferral and resolve the licensing application.  Since no money damages are sought from the FCC, the APA's waiver of sovereign immunity is clearly satisfied, and subject-matter jurisdiction is proper.

## B. The Hobbs Act Does Not Bar Review of Agency Inaction in District Court

The FCC may assert that the Hobbs Act (28 U.S.C. § 2342) vests exclusive jurisdiction to review FCC orders in the Courts of Appeals.  This defense mischaracterizes the nature of the Plaintiff's claim:

1. **Challenge to Inaction, Not Final Order:** The Plaintiff is not challenging the "validity" of a final FCC regulation or order, which typically falls under the Hobbs Act.  Instead, the Plaintiff is challenging the FCC's failure to act and its unreasonable delay in resolving a license application, an action reviewable under 5 U.S.C. § 706(1) of the APA ("compel agency action unlawfully withheld or unreasonably delayed").

2. **Collateral Constitutional Challenge:** Even if framed as a review of an FCC policy, the claim is a collateral constitutional attack based on the fundamental constitutional violation— the unlawful state prosecution—that gave rise to the FCC's punitive action.  This type of constitutional challenge, which requires fact-finding and relief against multiple sovereigns, is properly brought in the District Court.

**C.  Venue Is Proper in the District of Columbia and Must Not Be Transferred**

The State Defendants' request for a transfer of venue to the Northern District of Oklahoma, pursuant to 28 U.S.C. § 1404(a), must be denied. Transferring this unified case would destroy the controversy and contravene the mandatory jurisdictional framework of the Hobbs Act.

1. **The Hobbs Act Mandate Anchors Venue in D.C.:** The Hobbs Act (28 U.S.C. § 2342) ensures that the **D.C. Circuit Court of Appeals** is the single, designated appellate venue for challenges to FCC actions. This jurisdictional reality dictates that the D.C. District Court is the proper forum for the initial, unified judicial review, as it stands in the direct appellate stream required by Congress.

2. **Transferring to the Tenth Circuit Destroys the Unified Case:** This matter is a **single, unified case and controversy** against both state (§1983) and federal (APA) defendants. Transferring the case to an Oklahoma Federal Court, which is in the Tenth Circuit, would subject the FCC/APA claim to a court that cannot properly adjudicate the claim while preserving the exclusive appellate jurisdiction of the D.C. Circuit. The Tenth Circuit cannot grant a remedy on the APA claim without functionally circumventing the exclusive Hobbs Act mandate, thus destroying the unified case theory and the integrity of the statutory review scheme.

**D.  FURTHER IN THE ALTERNATIVE, Transfer to the Court of Appeals is the Appropriate Remedy, Not Dismissal**

**FURTHER IN THE ALTERNATIVE,** and only if the Court determines that the **Hobbs Act (28 U.S.C. § 2342)** exclusively vests jurisdiction in the Court of Appeals, the Plaintiff respectfully requests that the Court, in the interest of justice and judicial economy, **TRANSFER** the claims against the Federal Communications Commission (FCC) to the appropriate Court of Appeals pursuant to **28 U.S.C. § 1631,**

rather than dismissing the action. The Plaintiff does not waive his assertion that jurisdiction is proper in this District Court for the unified collateral constitutional attack.

Therefore, jurisdiction and venue over the FCC is proper and fully mitigated.

## XI. THE PLAINTIFF HAS STATED A VIABLE CLAIM FOR SELECTIVE PROSECUTION (COUNT 5)

The State Defendants' Motion to Dismiss Count 5 (Equal Protection/Selective Prosecution) must be **DENIED**. The Plaintiff has pleaded a justifiable constitutional controversy that warrants review by this Court. Count 5 survives the motion to dismiss because it states a separate and independent claim for **Declaratory Judgment** on a pure question of law, and it has otherwise pleaded a plausible claim for Selective Prosecution when afforded the liberal construction due to a *pro se* litigant.

## A. Count 5 States an Independent and Surviving Claim for Declaratory Judgment on a Pure Question of Law

Count 5 must be sustained as a separate and independent claim for **Declaratory Judgment** under 28 U.S.C. § 2201. This claim successfully pleads a **ripe legal controversy** concerning the scope of the Plaintiff's constitutional rights, which is a **question of law** that requires no new factual discovery to adjudicate and is immune to the procedural challenges raised by the Defendants.

1. **The Declaration Pleading:** The text of Count 5 establishes the precise and adverse legal conflict: the State Defendant (Kunzweiler) prosecuted the Plaintiff under the explicit legal theory that the Plaintiff was **"unable to invoke the right of self-defense"** because the Oklahoma Security Guard Act (50 O.S. § 1750.2(7)) **limits his legal authority to prevent only misdemeanors**. This interpretation was used to abrogate the Plaintiff's fundamental **Second Amendment** right to use force to prevent a violent felony.

2. **Adverse Legal Interest:** Plaintiff seeks a declaration from this Court establishing the unconstitutionality of the State Defendant's application of the statute to the right of self-defense. The parties have an **adverse legal interest** regarding the law itself, making the dispute a **ripe Article III case and controversy** that must be resolved.

3. **Survival of *Badwal*:** Because the claim for Declaratory Judgment rests on the **legal interpretation of the charging statute versus the U.S. Constitution**, it is a **pure question of law** derived solely from the operative facts of the conviction and the public statutes. This claim **does not rely on new factual allegations** concerning comparators and is therefore **immune** to the Defendants' *Badwal v. Bd. of Trs. of Univ. of D.C.* challenge.

**B. The Constitutional Standard for Selective Prosecution**

Even if the Court were to ignore the independent claim for Declaratory Judgment, the Selective Prosecution claim is sufficiently pleaded to survive dismissal, particularly when afforded the **liberal construction** due to a *pro se* litigant. To prevail on a claim of selective prosecution, the Plaintiff must satisfy the rigorous two-part test required under the Equal Protection Clause:

(1) Discriminatory Effect: The Plaintiff was singled out for prosecution while others similarly situated were not prosecuted; and

(2) Discriminatory Purpose: The prosecution was initiated with a discriminatory intent, such as to penalize the exercise of a constitutional right.

**C. Discriminatory Effect is Plausibly Pleaded**

The Amended Complaint plausibly pleads the **Discriminatory Effect** by asserting a clear legal "double standard" between private citizens and those acting in an official capacity.

- The prosecution's legal theory, based on a narrow interpretation of the Security Guard Act, treated the Plaintiff's lawful use of force in self-defense as a criminal act because he lacked the authority of a peace officer.

- This pleading asserts a differential application of the law: one standard for law enforcement (who are granted broad authority to prevent felonies) and a punitively narrow standard for the Plaintiff, who was acting in defense of life.

- While the specific factual details of a comparator (such as the facts included in Exhibit I) are necessary for proof or a later amended pleading, the general theory of disparate treatment based on occupational status and a denial of legal authority is **plausibly stated** and should be sufficient to proceed under the standard afforded a *pro se* plaintiff.

**D.  Purpose is Plausibly Pleaded**

The Amended Complaint pleads the requisite **Discriminatory Purpose** by arguing the charge was filed **"in violation of the Second Amendment Prohibition against infringing on the Right to Bear Arms."**

- The underlying criminal charge was based on a legal interpretation that denied the Plaintiff the **right of self-defense**—the core of the Second Amendment.

- By asserting that the prosecution was pursued under the theory that the Plaintiff **"unnecessarily resisted his own murder"**, the Plaintiff directly pleads that the State Defendant's intent was to punish and chill the exercise of a fundamental constitutional right to bear arms for self-defense.

- This allegation, that the State Defendant targeted the Plaintiff because he exercised a constitutional right, is a sufficient articulation of **discriminatory purpose** to satisfy the pleading standard at this stage.

Therefore, Count 5 must survive the Motion to Dismiss on the basis of the independent Declaratory Judgment claim, and should survive on the plausibility of the Selective Prosecution claim. If the Court finds any factual pleading deficient, the Plaintiff's **Conditional Motion for Leave to Amend** must be granted to cure the technical defect.

## XII.  REQUEST FOR CONDITIONAL LEAVE TO AMEND THE COMPLAINT

### A.  Failure to Plead *Monell* Liability

Should this Honorable Court find that the Plaintiff's arguments regarding **Municipal Liability** (based on the constitutional misconduct, discriminatory policy, and reliance on fabricated evidence) are procedurally deficient due to the omission of the proper municipal entities and individual actors, the Plaintiff respectfully requests **conditional leave to amend the Amended Complaint (ECF Doc. 28)** pursuant to Rule 15(a)(2) of the Federal Rules of Civil Procedure.

### B.  Good Cause for Amendment

The requested amendment is necessary to properly plead all claims that have been fully developed and articulated in this Opposition, thereby clarifying the full scope of **Section 1983 liability** and ensuring judicial economy.

1. **Monell Claim Against Tulsa County (Selective Prosecution):**

   - The factual and legal basis for the **Monell** claim against **Tulsa County**—the existence of a municipal policy of selective enforcement in violation of the Fourteenth Amendment's Equal Protection Clause—was fully realized and articulated during the preparation of this Opposition, requiring a close comparative analysis of prosecutorial conduct (Plaintiff's felony vs. similarly situated individual's misdemeanor, see Opposition at 10).

2. **Monell Claim Against the City of Tulsa/TPD (Evidence Manufacturing):**

- The claims of **malicious prosecution** and **manufacturing of evidence** (a *Brady* violation) establish a separate and independent **Monell** claim against the **City of Tulsa** and the **Tulsa Police Department (TPD)**. This is a separate municipal entity from the County.

- The **Plaintiff's conviction was rendered unlawful and voidable** due to the police misconduct and the District Attorney's subsequent **reliance on that tainted evidence**, thereby stripping the conviction of its legal effect and making the City/TPD directly liable for the resulting damages.

3. **Individual Liability Claims Against State Actors:**

- The Plaintiff must be granted leave to add **individual claims** for malicious prosecution and constitutional misconduct against the culpable **Tulsa Police Detectives** (Nance and Huff), and against **Defendant Kunzweiler** for his alleged ratification and reliance on the fabricated evidence as a final policy-maker for the District Attorney's office.

**C. Conclusion and Request for Conditional Leave**

Granting leave to amend will cause **no undue prejudice** to the Defendants, as all underlying facts regarding selective prosecution and evidence misconduct are known and have been extensively briefed in this Opposition. Furthermore, amendment will best serve the interests of **judicial economy**.

The Plaintiff therefore requests that, if the Court determines any of the Municipal or Individual Liability claims are procedurally lacking, it **simultaneously grant conditional leave** for the Plaintiff to file a Second Amended Complaint for the purpose of formally joining:

- **Tulsa County** (for the selective prosecution *Monell* claim).

- **City of Tulsa / Tulsa Police Department** (for the evidence manufacturing *Monell* claim).

- **The culpable individual Tulsa Police Detectives** (for individual liability claims).

## XIII.  MOTION FOR COURT-FACILITATED SETTLEMENT CONFERENCE

The Plaintiff respectfully requests that the Court immediately refer this entire matter to the Court's Alternative Dispute Resolution (ADR) program for an expedited Settlement Conference.  This request is based on the following grounds:

### A.  Realized Litigation Risk and Escalated Exposure

1. **Monetary Damages are Perfected:** The filing of this Opposition formalizes the Plaintiff's intent to pursue a **Monell liability claim** against Tulsa County, based on the Equal Protection violation and the clear comparative evidence of selective prosecution (see Exhibit I).  This claim exposes the County and State to substantial compensatory and punitive damages.

2. **High-Value Constitutional Questions:** The Opposition has established that the State's enforcement of the Manslaughter statute is now a live, viable constitutional question under *Bruen*.  The *Ex parte Young* claim, which challenges the validity of the underlying state law, compels the federal court to rule on an issue of major constitutional significance, increasing the litigation risk for the State.

### B.  Constitutional Avoidance and Judicial Economy

1. **Global Resolution is Necessary:** The unique entanglement of the claims—where the **FCC's punitive action** is dependent on the **State's unconstitutional conviction**—requires a global resolution to resolve the entire "Case and Controversy" under Article III.

2. **Mootness is the Most Efficient Outcome:** The most efficient outcome for the Court is a settlement that includes the State's agreement to facilitate the **concurrent vacatur of the**

**underlying conviction** (a core term of the Plaintiff's settlement demand). This action would render the constitutional question moot, allowing the Court to dismiss the entire federal action without having to rule on the merits of the statute or issue a binding precedent on the FCC's administrative deference.

3. **Preservation of Resources:** Given the established, high-value settlement posture and the imminent move to full discovery on complex municipal liability and constitutional issues, a Court-facilitated settlement conference is the most efficient and proper route to final, complete resolution, preventing a gross and unnecessary waste of judicial and party resources.

## XIV. MOTION FOR JUDICIAL REFERRAL TO THE OKLAHOMA BAR ASSOCIATION

The Plaintiff respectfully moves this Court to issue a **Report and Recommendation (R&R)** to the Chief Judge, formally recommending the referral of Defendant Steve Kunzweiler, District Attorney for Tulsa County, to the Oklahoma Supreme Court for professional and ethical misconduct.

This action is not discretionary. It is mandated by the ethical canons governing the Federal Judiciary and is compelled by the facts established in the Amended Complaint (ECF Doc. 28).

### A. The Judicial Obligation to Act

A federal judge is ethically obligated to address professional misconduct that raises a substantial question regarding a lawyer's fitness.

- **Mandatory Duty to Act:** The **Code of Conduct for United States Judges** establishes a mandatory duty. A judge who receives credible information indicating a substantial

likelihood that a lawyer has committed a violation of the Rules of Professional Conduct

**"shall take appropriate action"** (citing Judicial Code of Conduct, Canon 3(D)(2), or similar

state/model rule).

- **Protecting Integrity:** Judicial action is required to **"protect the interests of the public and to preserve the integrity of the courts and legal profession"** (*State ex rel. Okla. Bar Ass'n v. Kinsey, 2009 OK 31, ¶ 15, 212 P.3d 1186, 1192*). The current facts—alleging the DAs' misconduct in the underlying prosecution and subsequent defense of the instant civil suit—establish more than a "substantial likelihood" of misconduct.

**B. Summary of Professional Misconduct Allegations**

The misconduct allegations against District Attorney Kunzweiler and his office fall under

multiple Oklahoma Rules of Professional Conduct (ORPC), all supporting the necessity of this

referral:

1. **Ultra Vires Conduct & Lack of Probable Cause (ORPC Rule 3.8):** The Amended Complaint alleges the prosecutor was **"legally and ethically barred from continuing the prosecution"** due to a statutory grant of immunity (ECF Doc. 28 at 16, Count 6(a)). The prosecutor's alleged admission of not feeling obligated to consider the legislative intent of the immunity statute is characterized as **"irrefutable evidence"** of **"deliberate indifference"** to the limits of his power, constituting an **ultra vires** act. This misconduct strips Absolute Immunity and converts the action into unprotected **administrative misconduct of enforcement**.

2. **Conduct Prejudicial to the Administration of Justice (ORPC Rule 8.4(d)):** By defending an action known to be premised on an unlawful prosecution, the DAs force the Court and the

Plaintiff to expend resources on litigation that should have been conceded, violating the principles of **Judicial Economy**.

3. **Unconstitutional Motive and Malice:** The misconduct is compounded by evidence of **malicious intent**—acknowledged by the OCCA when the prosecutor asked the jury to **'take away Cowan's badge by convicting him'** (ECF Doc. 6-3 at 6, fn. 4). Furthermore, the alleged **selective and disproportionate treatment** of the Plaintiff compared to a similarly situated Black defendant provides the **"clear evidence" of discriminatory effect and intent** needed to sustain a claim that the prosecution was motivated by impermissible considerations (*Yick Wo v. Hopkins; United States v. Armstrong*).

**C. Independent Justification for Judicial Referral: Failure of State Accountability**

The severity of the alleged misconduct and the failure of state mechanisms require the use of this Court's Supremacy Clause authority.

- **Failure of State Remedy:** The Plaintiff's attempt to seek accountability through the proper state channels has proven futile. As evidenced by **Exhibit K**, the Oklahoma Bar Association (OBA) previously **declined to look into a high-profile ethics complaint against Kunzweiler**, instead advising the complainant to **"speak to the Oklahoma Attorney General"**.

**D. Requested Action**

Based on the mandatory ethical obligation of the judiciary, and the severity of the alleged professional misconduct, the Plaintiff respectfully asks this Court to recommend that the Oklahoma Bar Association investigate this matter and impose the highest professional sanctions.

- **Referral Recommendation:** The Court should issue an R&R referring Defendant Kunzweiler to the appropriate disciplinary authority.

- **Requested Sanction:** The Plaintiff further requests that the Court recommend **permanent disbarment or, in the alternative, his "voluntary resignation in lieu of discipline"** (citing *State ex rel. Okla. Bar Ass'n v. Kinsey, 2009 OK 31, ¶ 15*).

## XV.  CONCLUSION AND PRAYER FOR RELIEF

The Defendants' Motions to Dismiss attempt to dismantle the Plaintiff's theory by treating the State and Federal claims as separate, when they are, in fact, two links in a single chain of constitutional injury. The Plaintiff has no other adequate remedy at law, is not "in custody," and faces the permanent, punitive loss of a federal right to a license and livelihood without Due Process, based on a state law that is subject to a serious and substantial constitutional challenge under Bruen.

The Court should deny the Motions to Dismiss, rule that the Heck bar is inapplicable due to the Ex parte Young claim and the lack of a federal habeas remedy, and order the Defendants to file an Answer to the Amended Complaint.

**WHEREFORE**, Plaintiff Donald R. Cowan respectfully requests that the Court deny the Motions to Dismiss in their entirety and allow the case to proceed to the Discovery Phase.

**In the Alternative,** should the Court find that the language in the Prayer for Relief is procedurally deficient, the Plaintiff respectfully moves the Court to **grant leave to file a Second Amended Complaint** for the limited purpose of striking the overbroad requests for a *Trial De Novo* and an *Acquittal as a Matter of Law* and clarifying the request for prospective relief under *Ex parte Young*.

**FURTHER IN THE ALTERNATIVE,** and only if the Court determines that the **Hobbs Act (28 U.S.C. § 2342)** exclusively vests jurisdiction in the Court of Appeals, the Plaintiff respectfully requests that the Court, in the interest of justice and judicial economy, **TRANSFER**

the claims against the Federal Communications Commission (FCC) to the appropriate Court of Appeals pursuant to **28 U.S.C. § 1631**, rather than dismissing the action. The Plaintiff does not waive his assertion that jurisdiction is proper in this District Court for the unified collateral constitutional attack.

      **PRAYER FOR RELIEF**, For the foregoing reasons, the Plaintiff respectfully requests that the Court enter judgment against the Defendants, and grant the following relief:

1. **Deny** the Motions to Dismiss filed by all Defendants.

2. **Grant** the Plaintiff's **Motion for Conditional Leave to Amend** the Complaint, allowing the Plaintiff to file a Second Amended Complaint to formally join Tulsa County and plead the **Monell** claim.

3. **IMMEDIATELY REFER** this entire matter to the Court's ADR program for an expedited **Settlement Conference.**

4. **GRANTING** the Plaintiff's Motion for Judicial Referral, as set forth in Section XIV, and issuing a **Report and Recommendation to the Chief Judge to formally refer Defendant Steve Kunzweiler** to the Oklahoma Supreme Court for investigation into professional and ethical misconduct, with a recommendation for **permanent disbarment or, in the alternative, his voluntary resignation in lieu of discipline.**

5. **IN THE ALTERNATIVE,** should the Court find that any of Counts 5, 6, 7, 8, or 9 are currently barred by the *Heck v. Humphrey* doctrine, the Plaintiff respectfully requests that the Court exercise its inherent equitable powers to **STAY** the adjudication of those claims, pending the final resolution of Count 4.

6.  Grant the Plaintiff all other relief requested in the Amended Complaint, including the requested **Declaratory and Injunctive Relief** to permanently enjoin the Defendants from enforcing the unconstitutional statute and discriminatory policies.

Dated: December 8, 2025

Respectfully Submitted,

**_/s/ Donald R. Cowan_**
Donald R. Cowan, B.S.
Criminal Justice Administration & Ethics
_(Constitutional & Procedural Law Focus)_
Pro Se for the Plaintiff
3768 SE 48th PL, Oklahoma City,
Oklahoma 73135 | (405) 708-1756
Email: Cowan.Radio@gmail.com

**Supplemental Rule 11 Disclosure:**
The legal analysis contained in this submission is the product of the undersigned's own work and academic training, including formal coursework and final grades of **'A'** in: **Constitutional Law** and **Criminal Procedures**. The sophistication of this filing is a reflection of this documented educational background and is submitted without undisclosed legal assistance.

## XVI. EXHIBIT INDEX

(*** Exhibits directly attached—A, B, I, J, K all others already on Record ***)

**A. Oklahoma Court of Criminal Appeals Opinion (Exaustaion of State Remedies)**

**B. United States District Court, Northern District of Oklahoma, Opinion and Order Denying Habeas Corpus, Cowan v. Standifird, Case No. 10-CV-256-GKF-TLW.**

**C. Oklahoma Court of Criminal Appeals Summary Opinion (ECF No. 6-3)**

**D. Brief of Appellant to the Oklahoma Court of Criminal Appeals (ECF No. 6-1)**

**E. Brief of Appellee (State of Oklahoma) to the Oklahoma Court of Criminal Appeals (ECF No. 6-2)**

**F. D.C. District Court Order Denying Counsel (ECF No. 22)**

**G. Motion for Declaratory Relief (ECF No. 15)**

**H. Amended Complaint (ECF No. 28)**

**I. News Article: Security guard in Tulsa school shooting gets year probation. (News On 6)**

**J. Felony Attachment for FCC Application (Plaintiff's Sworn Statement on Self-Defense and Documented Mitigating Factors)**

**K. State Bar Association declines to take up ethics complaint filed against Tulsa County DA**

**XVII. CERTIFICATE OF SERVICE**

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on this **December 8, 2025**, a true and correct copy of the foregoing **"PLAINTIFF'S OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS AND CROSS-MOTIONS FOR RELIEF"** was served upon all counsel of record in this case via the Court's Electronic Case Filing (ECF) system. The ECF system will generate and send a Notice of Electronic Filing (NEF) to the following parties and their counsel:

**Jesse S. Ogle |** Assistant Oklahoma Attorney General
Oklahoma Attorney General, OK Bar No. 34275
Attorney for Viki Behenna and Steven Kunzweiler
313 NE 21st Street, Oklahoma City, OK 73105
Telephone: 405.522.2921| jesse.ogle@oag.ok.gov

**Derrick A. Petit** | Assistant United States Attorney
Civil Division, U.S. Attorney's Office, D.C. No. 144466
Attorney for the Federal Communications Commission
601 D Street, NW, Washington, D.C. 20530
Derrick.Petit@usdoj.gov
(202) 252-7269

*/s/ Donald R. Cowan*
Donald R. Cowan, B.S.
Criminal Justice Administration & Ethics
*(Constitutional & Procedural Law Focus)*
Pro Se for the Plaintiff
3768 SE 48th PL, Oklahoma City,
Oklahoma 73135 | (405) 708-1756
Email: Cowan.Radio@gmail.com