Federal Communications Commission
Washington, DC 20554

**OFFICE OF
COMMISSIONER GOMEZ**

E x h i b i t   A

May 11, 2026

Mr. Josh D'Amaro
Chief Executive Officer
The Walt Disney Company

**RE: This Administration's Campaign of Censorship and Control Against Disney and ABC**

Dear Mr. D'Amaro,

I am writing because The Walt Disney Company has once again been made a target by this FCC, and the record of its actions against your company demands a clear accounting.

What Disney and ABC are facing is not a series of coincidental regulatory actions but a sustained, coordinated campaign of censorship and control, carried out through the weaponization of the FCC's authority as a federal regulator and aimed at pressuring a free and independent press and all media into submission.

You are not the first target of this campaign, and you will not be the last. But Disney's experience is, by now, the most documented, and it is worth laying it out plainly.

This Administration's campaign against Disney and ABC began in earnest when ABC agreed to pay $15 million to settle a baseless defamation lawsuit brought by the incoming President of the United States. Whatever the legal calculations behind that decision, its effect was immediate and unmistakable. It told this Administration that pressure works. It told every other company watching that capitulation was an option. And it opened the door to every action that has followed.

That settlement did not buy you peace. It only bought you time. Disney's experience since then has made one thing undeniable for any company facing the same pressure. You cannot buy this Administration's favor. For the right price, you can only borrow it. And the price always goes up.

Since that settlement, the FCC has pursued your company on multiple fronts, none of which reflect legitimate regulatory enforcement.

In late 2024, a politically motivated outside organization filed a complaint with the FCC alleging that ABC violated the FCC's news distortion policy in its coverage of the presidential campaign, specifically the presidential debate ABC journalists moderated. Agency staff reviewed that complaint and dismissed it in January 2025, finding it contrary to the First Amendment and that it failed to even assert a set of facts that, if true, would violate FCC rules.[1] This FCC revived it anyway, for reasons that have nothing to do with the merits and everything to do with politics. It is

---

[1] *See, Preserving the First Amendment, GN Docket No. 25-11*, released January 16, 2025. (https://docs.fcc.gov/public/attachments/DOC-408880A1.pdf)

unclear to what degree this FCC has even seriously pursued that complaint, and I suspect there will be no end in sight for that investigation because the process is the punishment and keeping it open serves that goal.

Then, in March 2025, the FCC opened an investigation into Disney and ABC's diversity, equity, and inclusion programs, directing the Enforcement Bureau to demand a full accounting of your company's diversity policies and practices. The FCC's broadcaster equal employment opportunity (EEO) rule is limited to requiring broadcasters to conduct broad, inclusive recruitment outreach.[2] This narrowly tailored rule resulted from significant and hard fought litigation over years that addressed both the scope of the Commission's authority and the substantial intrinsic dangers that arise from the Commission using its licensing authority to enforce its views of the "correct" racial or gender balance in employment practices, dangers this FCC's current course of action exemplifies precisely. As the D.C. Circuit stated when vacating the FCC's prior EEO rule as unconstitutional, "the FCC is not the Equal Employment Opportunity Commission . . . and a license renewal proceeding is not a Title VII suit" because the agency's authority is limited by its statutory remit.[3] And in its subsequent decision vacating the Commission's revision of its EEO rule, the court went further and described the inherent coercive danger of investigations on alleged discrimination by licensing agencies such as the FCC.[4]

The FCC's attempt to usurp control over internal corporate decision-making through its limited authority requires reaching for legal power that the statute, agency rules, and the applicable case law simply do not provide. Courts have repeatedly and decisively determined that actions such as the FCC's current investigation are unconstitutional. Despite the extraordinary overreach this investigation represents, it is my understanding that Disney has engaged with the agency in good faith and timely responded to the Commission's Letter of Inquiry and Supplemental Letter of Inquiry by producing over 11,000 pages of responsive documents to date.[5]

Last year, this Administration tasked the FCC to escalate its campaign against ABC by targeting Jimmy Kimmel. The goal was clear: use regulatory pressure to force his removal from the air and send a message to every other broadcaster about the cost of critical coverage. Under that pressure, Disney pulled Kimmel off the air. But the public outcry from local communities across the country and democracy watchers around the world was immediate, broad, and impossible to ignore. Viewers and community voices from across the political spectrum and every corner of our great nation, including small towns, large cities and everything in between, made themselves heard, and that pressure forced Disney's hand to have Kimmel reinstated.

What that moment revealed is something with which this Administration has never fully reckoned. When the government tries to dictate what people can watch and who is allowed to speak, the

---

[2] 47 C.F.R. § 73.2080.

[3] *Lutheran Church-Missouri Synod v. FCC*, 141 F.3d, 344, 354  (D.C. Cir. 1998) (citing *Bilingual Bicultural Coalition on Mass Media, Inc. v. FCC,* 595 F.2d 621, 628 (D.C. Cir. 1978)) ("The only possible statutory justification for the Commission to regulate workplace discrimination would be its obligation to safeguard 'the public interest,' and the Supreme Court has held that an agency may pass antidiscrimination measures under its public interest authority only insofar as discrimination relates to the agency's specific statutory charge.").  *See also*, *Title VII of the Civil Rights Act of 1964*, 42 U.S.C. §§ 2000e–2000e-1.

[4] *MD/DC/DE Broadcasters Ass'n v. FCC,* 236 F.3d 13, 19 (D.C. Cir. 2001) (Investigation by the licensing authority is a powerful threat, almost guaranteed to induce the desired conduct. [*See Chamber of Commerce v. Department of Labor*, 174 F.3d 206, 210 (D.C. Cir. 1999)] (noting that agency "is intentionally using the leverage it has by virtue solely of its power to inspect.  The Directive is therefore the practical equivalent of a rule that obliges an employer to comply or suffer the consequences; the voluntary form of the rule is but a veil for the threat it obscures")).

[5] *See, KTRK Television, Inc. and American Broadcasting Companies, Inc, Petition for Declaratory Ruling Under Section 315(a) of the Communications Act of 1934, as Amended*, at page 4, fn. 17, filed May 7, 2026 (*KTRK Petition*). (https://www.fcc.gov/ecfs/document/10507899614175/1)

American public will fiercely defend their First Amendment rights, the most fundamental freedom we have in this country.

Earlier this year, the FCC opened yet another investigation into ABC, this time targeting *The View* over an alleged equal opportunities violation stemming from an appearance by a political candidate. To facilitate these investigations, this FCC's Media Bureau issued new interpretive guidance on the equal opportunities rule that upended decades of settled agency precedent, rewriting the rules of the road specifically to create new exposure for broadcasters it wanted to target.[6] The pattern by now is familiar: a complaint is filed, an investigation is opened with maximum visibility, and the process itself becomes the pressure.

This Commission has repeated that same pattern across multiple companies it regulates. These investigations are often announced with much fanfare, pursued selectively against perceived critics of this Administration, and most are destined never to be brought to any enforcement conclusion that could face judicial review. That is because the threat is the point. As sitting Supreme Court Justice Neil Gorsuch recently reminded us by invoking Justice Thurgood Marshall: "The value of a sword of Damocles is that it hangs, not that it drops."[7]

And the double standard could not be more glaring. This FCC has trained its enforcement apparatus on ABC while staying conspicuously silent about other broadcasters operating under the exact same rules, in the same markets, that aired interviews with political candidates without filing notices and received no inquiry, no letter, and no investigation whatsoever.[8] Meanwhile, in what appears to be a form of entrapment, the Commission selectively pressured ABC affiliates in Texas to file late equal opportunities notices while offering them amnesty for doing so, then used the resulting inconsistency *that the Commission helped create* as evidence against your station, which received no such offer.[9] If true, that is a government agency abusing its authority to punish speech it dislikes while protecting speech it favors.

In what is now the most egregious assault on the First Amendment this FCC has taken to date, the agency has directed Disney's eight ABC-owned local television stations to file for early license renewal, a mechanism that has not been invoked in more than half a century. Some of these licenses

---

[6] *See, FCC's Media Bureau Provides Guidance on Political Equal Opportunities Requirement for Broadcast Television Stations*, DA 26-68 (January 16, 2026) (*Media Bureau PN*).

[7] *First Choice Women's Res. Ctrs., Inc. v. Davenport*, 598 U.S. _ (April 26, 2026), No. 24-781.

[8] *See, KTRK Petition* at pp. 37-38.

[9] The facts as described by Disney, if true, are disturbing. In 2002 the FCC's Media Bureau issued a declaratory ruling that *The View* is a *bona fide* news interview program exempt from the equal opportunities provision. *See, KTRK Petition* at pp. 27-28. This January the FCC's Media Bureau issued a Public Notice creating confusion over longstanding guidance on how the *bona fide* news exemption from the Commission's equal opportunities rule should be applied and included an invitation for shows to file petitions to obtain clarity. *See Media Bureau PN* at p 4. The Commission appears to have followed this up with actions that helped create the facts on which it relied as a basis for its investigation of KTRK Television (KTRK), the Disney owned and operated ABC broadcast station in Houston Texas. Specifically, it is alleged that on February 11, 2026, following James Talerico's February 2, 2026, appearance on *The View*, the FCC sent a Letter of Inquiry to KTRK asking whether it took the position that *The View* qualified as a *bona fide* news interview program and had placed a record of James Talerico's appearance in its political file. *See, KTRK Petition* at pp. 2-4. KTRK timely responded that *The View* qualifies as a *bona fide* news interview program and it had not placed such a record in its political file. *Id.* The Commission then issued a Supplemental Letter of Inquiry (SLOI) on March 26, 2026, based, at least in part, on the assertion that KTRK's position was contradicted by the positions taken by 19 of ABC's affiliated stations in Texas, as they all had placed such records in their political files. *Id.* The SLOI allegedly failed to note, however, that those filings were made more than two weeks after the appearance at issue and in response to the FCC's direction that making such filings would protect them from an enforcement action. *Id. See also,* FCC public inspection files (https://publicfiles.fcc.gov/ ) to view publicly filed records of James Talerico's February 2, 2026 appearance on *The View* by ABC Texas affiliates (e.g., WFAA (Dallas–Fort Worth) filed 2/20/2026; KTXS-TV (Abilene/Sweetwater) filed 2/20/2026 and KVII-TV (Amarillo) filed 2/20/2026).

were not set to come up for renewal for nearly five years. Using the licenses of individual local stations as leverage against a parent company is an extraordinary and dangerous misapplication of this agency's authority. The FCC licenses local broadcast stations, not national networks, and every action taken against these stations is, in truth, an action taken against local communities and against press freedom.

Ultimately, this effort to punish and intimidate your company will not succeed. The FCC's internal process will be lengthy, and should it produce an outcome unfavorable to your stations, Disney will have every right to challenge that outcome in federal court, a process that could take years. Throughout all of it, Disney's stations keep their licenses.

Disney has been here before. When the state of Florida came after the company with the full weight of its government, Disney fought back and won. The same resolve that carried that fight can carry you in this one. The First Amendment does not belong to this Administration to grant or withhold. It belongs to the public, to the press, and to every broadcaster willing to defend it.

Your stations serve real communities, and the audiences who depend on ABC extend far beyond those eight licenses. Your journalists do work that matters to millions of Americans across the country, and the viewers who rose up to defend Jimmy Kimmel are the same viewers who will stand up again if this FCC follows through with its threat. I am encouraged to see that Disney is choosing courage over capitulation. The fight ahead may not be easy, but the law, the facts, and the public are on your side. This is a fight worth having, and one that I am confident you will win.

I am committed to using every tool available to me as a Commissioner to shine a light on what this FCC is doing to curtail press freedom and to hold this process to account at every step.

Sincerely,

Anna M. Gomez
Commissioner
Federal Communications Commission